CULBERTSON v. METROPOLITAN STREET RAILWAY COMPANY, *Appellant*.

Division Two, June 8, 1897.*

1. **Contributory Negligence**: DEATH BY ACCIDENT. Plaintiff's own evidence having shown that her deceased husband had safely crossed an intersecting street railroad and he and his companion in broad daylight in a buggy saw a cable car just starting toward him from a point from fifty to one hundred feet distant on the track on which he was driving, and it appearing that he had sufficient time then to have driven west of the track and had ample roadway, on that side, but attempted by speeding his horse to pass the approaching car in a

*NOTE—Decided June 30, 1896; rehearing denied June 8, 1897.

140  35
157  227

140  35
94a  ᵇ282

140  35
97a  ¹278
d100a 669

defile to the east of the track which was too narrow to allow his buggy to pass, and thereby was produced the collision with said car which caused his death, he was guilty of such contributory negligence as will bar a recovery by his widow.

2. **Negligence**: ORDINANCE: RIGHT SIDE OF STREET. In a suit against a street railway for damages for killing plaintiff's husband, where the evidence was that he had ample opportunity to turn his horse and buggy to the left of the track, but on the contrary that he turned it to the right thereof, it was error to admit in evidence a city ordinance requiring all persons who meet in a street to turn to the right, such ordinance being inapplicable to the case, even for the purpose of showing deceased was exercising ordinary care in driving to the right.

3. ——: CROSSING: HYPOTHETICAL QUESTION. Where the grade and surroundings of a railroad crossing are far from the ordinary, it is error to permit a witness, in answer to a question which embraces none of the controlling facts, to state within what distance a train could be ordinarily stopped.

4. ——. An adult traveler, laboring under no disabilities, can not disregard all the laws of prudence and blindly rely upon a signal given by a flagman of a railroad as gauranteeing his safety, when his own senses plainly indicate the peril of obeying such a signal.

5. ——: INSTRUCTION: PRESUMPTION. Where the great preponderance of the evidence is that the flagman did not signal the deceased to drive his buggy over the track, and that when he attempted to do so the flagman and others warned him, and attempted to drive his horse back, it is error to instruct the jury that if they believe from the evidence that the flagman signaled deceased to go over said crossing he had the right to presume that the train on said road would not move over the crossing while he was attempting to comply with the invitation.

6. ——: CONSISTENT DUTIES. While it is the duty of a gripman on the cable car to keep a constant lookout for travelers and pedestrians over the track, yet not inconsistent with such duty is the paramount one of using every reasonable precaution for the safety of the passengers on his car, and if in compliance with this paramount duty his attention is momentarily diverted from the former one, his conduct is not negligent.

7. ——: DAMAGES: AWARD. Where different acts of negligence are alleged and relied upon for recovery, and some of them bring the case within the penalty clause of section 4425, Revised Statutes 1889, and others bring it within section 4426, it is error to instruct the jury that their verdict, if for plaintiff, must be for the statutory penalty of $5,000.

8. **Different Acts of Negligence.** A railroad's failure to employ capable watchmen and its failure to have a sufficient number of watchmen at the crossing where the accident occurred do not constitute "negligence in operating the cars or train," within the meaning of section 4425, Revised Statutes 1889.

9. ———: UTMOST CARE: CONTRIBUTORY NEGLIGENCE. Where the facts in evidence show that the gripman of a cable car was exercising the highest degree of care, and that the deceased was guilty of negligence directly contributing to his death, a demurrer to the evidence should be sustained.

*Appeal from Cass Circuit Court.*—HON. W. W. WOOD, Judge.

REVERSED.

*R. T. Railey, James Black* and *Pratt, Ferry & Hagerman* for appellant.

(1) There was error in admitting in evidence section 701 of the Revised Ordinances. This section had no application in the case of a vehicle meeting a street railway train. Booth on Street Railways, sec. 302; *Spurrier v. Railroad,* 3 Wash. 659; *Hegan v. Railroad,* 15 N. Y. 380. (2) There was error in admitting proof that defendant was notified of the fact that Looney was a drinking man, and that he was in the habit of drinking before the accident. This testimony was wholly immaterial, for if the flagman was negligent, then defendant was responsible regardless of what he had ever done before, or regardless of the question of his capacity, and whether he had been negligent at some time before was wholly immaterial. *Alcorn v. Railroad,* 108 Mo. 81. (3) There was error in admitting the testimony of Orville F. Trueblood. The question as to within what space a car can be stopped is a matter of expertness. The question was not a proper hypothetical one, nor a proper expert question, because it did not ask as to the partic-

ular place in question or take into consideration the circumstances and conditions surrounding the situation. (4) There was error in giving plaintiff's instruction 6. *First.* The instruction assumed that the train passed over the crossing while Culbertson was on it, whereas, in truth, the collision did not even occur at the crossing, and had Culbertson turned to the left instead of to the right he would not have been injured. *Second.* The instruction assumes that Culbertson diligently complied with the invitation of the watchman, whereas there was an abundance of testimony that the flagman tried to beat his horse off and make him go to the left, but Culbertson refused to pay any attention thereto or to the other warnings given. *Third.* Upon the facts of this case it was erroneous to say to the jury that there was any right to presume. *Lynch v. Railroad,* 112 Mo. 420; *Weller v. Railroad,* 120 Mo. 635; *Myers v. Kansas City,* 108 Mo. 480; *Moberly v. Railroad,* 98 Mo. 183; *Rapp v. Railroad,* 106 Mo. 423; *Bluedorn v. Railroad,* 121 Mo. 270; *Hamm v. Barrett,* 28 Mo. 388, 389; *Chouquette v. Barada,* 28 Mo. 491; 2 Thompson on Trials [4 Ed.], sec. 2290. The instruction is vicious because it singles out an isolated matter and gives undue prominence thereto. *Anderson v. Kincheloe,* 30 Mo. 520; *Clark v. Hammerle,* 36 Mo. 620; *Fine v. St. Louis Pub. Schools,* 39 Mo. 59; *Campbell v. Allen,* 38 Mo. 213; *Jones v. Jones,* 57 Mo. 138; *Forrester v. Moore,* 77 Mo. 651; *Weil v. Schwartz,* 21 Mo. App. 372; *Schulter v. Ins. Co.,* 1 Mo. App. 285. *Fourth.* The instruction was erroneous in that the right to presume was given without regard to whether Culbertson knew that the train was coming, or by the exercise of ordinary care could have known it. *Lynch v. Railroad,* 112 Mo. 420; *Weller v. Railroad,* 120 Mo. 635; *Grippen v. Railroad,* 40 N. Y. 34; 1 Shearman & Redfield on Negligence [4 Ed.], sec. 92. (5) There was

error in giving plaintiff's instruction 3. *First.* The testimony showed that there were other duties for the gripman to perform at the time of making this crossing, which rendered it impossible for him to look ahead at all times, and under such circumstances the law does not require a gripman to be constantly looking ahead. *Kennedy v. Railroad,* 43 Mo. App. 1; Booth on Street Railways, sec. 306. (6) There was error in giving plaintiff's instructions 1 and 8. These instructions require the penalty of $5,000, whereas there was submitted to the jury the acts of negligence of the company in failing to employ capable watchmen and in failing to have a sufficient number of watchmen. In such a case the penalty clause has no application. *Elliott v. Railroad,* 67 Mo. 272; *Holmes v. Railroad,* 69 Mo. 536; *Flynn v. Railroad,* 78 Mo. 195; *Sullivan v. Railroad,* 97 Mo. 113; *Crumpley v. Railroad,* 98 Mo. 34; *King v. Railroad,* 98 Mo. 235; *Rapp v. Railroad,* 106 Mo. 423. And where there are several acts of negligence, some of which bring the case within the penalty clause of the statute, and some of which do not, it is error to instruct for the penalty. *Crumpley v. Railroad, supra; King v. Railroad, supra; Rapp v. Railroad, supra.*

*Buckner, Bird & Lake* and *W. L. Jerrott* for respondent.

(1) "The Supreme Court . . . shall not reverse the judgment of any court, unless it shall believe that error was committed by such court, against the appellant . . . and materially affecting the merits of the action." R. S. 1889, sec. 2303. The presumptions are all in favor of the validity of the judgment appealed from. *Riley v. Valandingham,* 9 Mo. 817. (2) There was no error committed in the

introduction of ordinance 701. The ordinance was not introduced for any other purpose than to show the deceased was in the exercise of ordinary care, and driving where he might reasonably be expected to drive under the circumstances in taking the right side of the street. If it had even been introduced to prove such an absurdity as claimed by appellant, the evidence was properly limited in its scope by instruction 8 given to appellants. (3) The testimony showing the flagman Looney was drunk at the time of the accident was competent to show he was in no condition to be careful; and the mere fact respondent showed more than she was required to show by showing that he had been drunk on other occasions and that defendant had knowledge of it, gives appellant no right to complain. *Williams v. Railroad*, 109 Mo. 475; *Werner v. Railroad*, 44 N. Y. 465. (4) There was no error in admitting the testimony of Orville B. Trueblood. He properly qualified as an expert. The same facts were established by other witnesses. It was nowhere contended that the gripman did not stop the train very quickly after he saw deceased, but the negligence complained of was his failure to keep a lookout for persons on the track, and in his failure to discover deceased in his position of danger when he could have done so. The negligence was in not seeing deceased in time to have stopped his train when he could have done so had he been looking. *Hoffman v. Railroad*, 51 Mo. App. 273. (5) Instruction 6 simply asserts that if the watchman, stationed at the place where the injury occurred, signaled and invited the deceased to go over said crossing, he was guilty of no negligence in attempting to do so. Instructions must be construed in the light of the evidence and circumstances of each particular case. *Boest v. Railroad*, 66 N. Y. 639; *Sharp v. Glushing*, 96 N. Y. 676; *Sweeney v. Railroad*, 10 Allen, 368; *McGee v.*

*Railroad*, 92 Mo. 208; *Schultze v. Railroad*, 32 Mo. App. 439. (6) It is the affirmative action on the part of the railroad company in extending the invitation to cross, which allows .him to indulge in his feeling of security and to think he would not be injured. This distinction is carefully noted in the above cases and is absolutely wanting in every case cited by appellant. The instruction was a proper statement of the law under the facts in the case and was in no sense a comment on the evidence. *Fusili v. Railroad*, 45 Mo. App. 535; *Railroad v. Clough*, 134 Ill. 586; *Railroad v. Adler*, 129 Ill. 335; *Railroad v. Sloan*, 125 Ill. 72; *State v. Railroad*, 80 Me. 430; *Callahan v. Railroad*, 52 Hun. 276; *Whelan v. Railroad*, 38 Fed. Rep. 15. (7) Respondent's instruction number 3 was a proper instruction. *Winters v. Railroad*, 99 Mo. 509; *Humbird v. Railroad*, 110 Mo. 80; *Hiltz v. Railroad*, 101 Mo. 36; *Gulick v. Clarke*, 51 Mo. App. 26; *Kellny v. Railroad*, 101 Mo. 67; *Dunkham v. Railroad*, 95 Mo. 233; *Pope v. Railroad*, 99 Mo. 400. (8) The direction of the jury to return a verdict for the penalty of $5,000 was proper. The case was tried upon the theory that deceased was struck and killed by the negligence of the servants of appellant, whilst running and conducting its train, when by the exercise of ordinary care they could have avoided the injury. And while respondent might have submitted the case on other acts of negligence proven it did not do so. Every instruction authorizing a recovery required a finding that it was the negligence of the servant running, managing, and operating the train. Such penalty is allowed by the statute, section 4425. The defendant is bound to stand upon the theory it adopted on the trial. *Smith v. Callahan*, 74 Mo. 388; *Davis v. Brown*, 67 Mo. 313; *Teabo v. Goode*, 67 Mo. 126; *Noble v. Blount*, 77 Mo. 242; *Holmes v. Braidwood*, 82 Mo. 610; *Fairbanks v.*

*Long*, 91 Mo. 628; *Reily v. Railroad*, 94 Mo. 611. (9) In conclusion, we maintain that the case is absolutely free from error. Certainly no error or irregularity can be shown or has been shown which would have produced a different verdict.

GANTT, P. J.—This is an action by the widow of William Culbertson, deceased, for damages occasioned by the killing of her husband in a collision between a cable street car on defendant's road in Kansas City with a buggy in which plaintiff's husband was riding and driving at the time. The action was commenced in Jackson county and a change of venue was awarded to Cass county, where there was a verdict and judgment for $5,000, from which defendant appeals.

Plaintiff's husband was killed a few feet north of "the junction" of Delaware and Ninth streets in Kansas City on May 27, 1893.

To intelligently understand the situation reference must be had to the plat accompanying this opinion, which was in evidence in the circuit court.

The street car line runs south on Delaware street and at Ninth street crosses the double track cable railway of what was then known as the Kansas City Cable Railway Company or Ninth Street Line, running east and west. The cable ropes of the two companies pass at right angles, but the Ninth Street Line has the upper rope, and hence for one of the Metropolitan Street Railway Company's trains or cars to pass over this crossing its gripman must, in order to avoid striking the rope of the other line, at a proper distance before reaching the crossing, loosen his grip and drop the cable which pulls his train or car, and allow his train of its own momentum to cross the Ninth street tracks. Delaware street approaches Ninth on an up grade of nearly six per cent.

In the practical operation of the road defendant's trains stop or slow down about one hundred feet north of this crossing, and upon a signal from a flagman stationed at the junction, the gripman puts his train in full motion until he gets to a slight curve in the track where he drops his cable rope at the point known as the "let-go," and then the train proceeds with the momentum thus acquired up the grade and across the tracks where the grip again takes hold of the cable. The defendant's road as it approaches this crossing from the north makes a curve to the east and runs southeasterly until it comes within a few feet of the sidewalk on the east side of Delaware street, opposite the building standing in the angle between Main and Delaware. For some distance from the junction north on this side there is not enough room between defendant's street car track and the sidewalk for an ordinary single buggy to pass, but on the west side of the street between the track and the sidewalk there is ample roadway for vehicles. Just south of "the junction" Main and Delaware streets run together, and from that point south the street is known as Main street, and the tracks on the prolongation of what was Delaware street extend southeastwardly to a junction with tracks of the same company on Main street. Between the two sets of tracks, after they cross Ninth street, there is a broad, paved roadway, in which a team can stand in safety. On the day plaintiff's husband was killed he drove north, between the hours of 5 and 6 o'clock in the afternoon, on Main street between the Main and Delaware streets tracks into this intervening space between the roads. At this point, according to Mr. Brent, who was riding in the buggy with Culbertson when he was killed, they came to a dead standstill about twenty-five feet from the Ninth street track. He details their movements from this on. He says at a signal from a

man who turns the "gypsy" at this junction, Mr. Culbertson, who was driving, started north across the Ninth street tracks into the mouth of Delaware street. He started as slow as a horse could start.   He crossed the Ninth street tracks right at the corner of the *Times* or junction ticket office building, and on the tracks of the defendant's street railway, and was driving down the track north.   *Just as their hind wheels were on the north track of the Ninth street line they saw a cable car just north of them on these same tracks, in the act of starting* south directly toward them.   Thereupon they pulled their horse into the right or east of the track. The car was then somewhere between fifty and one hundred feet from them according to his guess.   When Culbertson saw the car approaching he made a desperate effort to turn to the right or east of the car, and *seizing his whip increased the speed of his horse*, and when near the point sixteen feet north of the north rail of Ninth street line the car and the buggy collided for want of space for both between the track and sidewalk and · Culbertson was thrown out on the rock sidewalk right about the telegraph pole and injured so that he died.   The gripman stopped his car so that its front or south end extended a few feet south of the buggy. The gripman at the time was making the crossing; that is to say, he had "let go" the cable and it was moving with acquired momentum, and deceased was driving rapidly north attempting to get where the space was wider between the sidewalk and the tracks.   Had deceased turned to the left when he discovered the car on the track he could have easily avoided the collision.

Point "D" on the plat represents the telegraph pole alluded to by the witnesses.   "E" is the junction of the east rail of defendant's track with the north rail of Ninth street track at the southwest corner of the *Times* or Junction building.   "C" is the south end of

the curve in the road, and "B" is its north end. From the junction of the rails of the two roads at the corner to the telegraph pole is sixteen feet, the point of collision. From their junction· to the "let-go" is fifty feet, six inches. From "E" to the beginning of the curve is seventy-one feet.

The petition charges thirteen distinct acts of negligence, the most important of which are the failure to have a competent flagman; failure to have sufficient number of flagmen; that the flagman negligently signaled Culbertson to cross; that the flagman negligently permitted Culbertson to drive on the tracks when the train had been signaled to cross; that the watchman was negligently stationed on the north side instead of south side of the crossing; that the gripman negligently failed to stop his car after Culbertson got into a place of danger.

The testimony for the plaintiff consisted of the evidence of Mr. Tuttle who made the plat in evidence. He explained the points and relative distances and the manner of making a crossing by two cable lines. ·Mr. Brent, in addition to the portions of his evidence already noted, testified that Culbertson turned the horse to the right although he, Brent, remembered no vehicles being to the left. He gave as the reason for going to the right that "it was the natural inclination of every driver to go to the right and because the *law required him to do so.*" As supporting this theory, plaintiff offered section 701 of the Revised Ordinances of Kansas City, requiring each vehicle meeting another to turn to the right, although the defendant at the time objected to the introduction of such section as incompetent and having no application to the case where a vehicle met a street car. This is one of the errors relied upon in the argument.

Ordinance number 46,075 was offered, this being

an ordinance to regulate the method of crossing, and required the defendant's cars, before making the crossing to stop or slow down one hundred feet north thereof, for a signal. Other witnesses testified for the plaintiff, and the tendency of their testimony was to show that there was but a single watchman at the crossing; that he gave a signal which Culbertson evidently took for him to cross, and these witnesses so understood it, and that Culbertson undertook to make the crossing at the time the train was north of the curve, and that the gripman was not looking ahead until at or about the time the collision occurred. Some of this testimony was also to the effect that there were vehicles on the west of Delaware street which might have interfered with Culbertson's driving at such place, but they practically concede that Culbertson whipped up his horse and drove rapidly, turning to the right, and that the whole transaction occurred almost instantaneously.

A. J. Akers, who, at a former trial, had testified for the defendant, and such testimony was offered by the defendant, was called as a witness for the plaintiff, and it appeared that at the time of the accident he had been in the employ of the Ninth street line as a sort of watchman for foot passengers upon the pavement, and he testified that Looney, the defendant's flagman, was under the influence of liquor upon the day in question and had been in the habit of getting under the influence of liquor, of which fact the superintendent of the road had prior to that time been advised. This testimony was contradicted by that of defendant's witness, John Peterson, and Looney, and besides this the testimony showed that Akers and Looney had had some trouble; but in addition to permitting proof of the condition of Looney at the time, the court, over the objection of the defendant, permitted the plaintiff to

prove that he. had been in the habit of getting under the influence of liquor prior to that time and that defendant was notified thereof.

Upon the defendant's behalf there was ample testimony that the unfortunate accident was brought about solely through the fault of Culbertson, who, after starting to go over the crossing, instead of turning to the left where there was plenty of room, attempted to whip up his horse and drive into the right, ahead of the train, and there was not time after the appearance of danger to stop the car.

W. C. Grimes testified that he was driving in an open buggy south on Delaware street, and was approaching the crossing of the two lines at the junction when his attention was attracted to the gypsyman attempting to turn Culbertson's horse to the left. Grimes had stopped just before the crossing of the Ninth street tracks to let the car going east pass, and there was plenty of room for Culbertson and his buggy, after the car passed east, to have turned to the west of witness, or even east, when he would have been out of danger, but the horse about this time turned toward the corner of the sidewalk, and going faster, was caught at or about the telegraph pole.

M. A. Pursley, who was the assistant ticket agent in the Burlington ticket office at the southwest corner of Ninth and Delaware streets, saw the accident from his office and saw Culbertson's horse and buggy first when they were on the Ninth street tracks, and he says there was plenty of room then for the driver to have turned out to the west and to have avoided the collision.

George W. C. Bryant saw the accident from the same point; saw Culbertson drive onto the Ninth street tracks at the same time defendant's car was coming up Delaware street to make the crossing. He says that

Culbertson saw the car, rushed his horse up, turned to the right and tried to beat the car.

J. C. Ashton was seated on the west side of the grip car near the gripman and did not see the horse and buggy until just before the accident, when they were within four or five feet of the front of the train, at which time the gripman had already let go of the cable and was trying to stop the car; and from the time he first saw the appearance of danger, the grip car went about its own length. He says that the gripman had been ringing his bell from the time he got the signal to cross; and applied his brakes to stop the car about the time the witness first saw the horse.

Charles A. Morrison saw the horse and buggy about the time Culbertson was going to cross the Ninth street tracks, and the car was then about forty-five feet distant and the horse was going as fast as the car; that there was nothing to prevent the buggy from turning to the left, and that when the car stopped after the collision, it was not to the Ninth street track.

E. R. Wilson stood by the telegraph pole where the accident happened; saw Culbertson drive on the Ninth street tracks from behind the east bound Ninth street car, and then coming in a good, fast trot, after angling the corner, whipped his horse up. The approaching cable train was then in the curve, and the gripman when he first saw him was letting go of the cable rope; bent over to let it go, and as he raised up, applied the levers to stop the car; that the time intervening between the seeing of the horse on the Ninth street tracks and the car at the curve, and the accident, was very short. He also says that Culbertson could have turned to the left without any hindrance.

S. B. Middleton was in the Junction ticket office at the time of the accident. Culbertson's horse was

going slow when he first saw it south of Ninth street, but after that the horse seemed to take two or three jumps which brought him to the telegraph pole where the accident occurred.

Robert Dunlap, a police officer, was stationed, at the time of the accident, at the junction near the Burlington ticket office, and first saw Culbertson driving north between the two tracks on Ninth street. At that time he saw the defendant's train approaching the crossing and yelled to Culbertson to "look out," and just then Culbertson reached for his whip and struck his horse, which instead of getting off the track went at a lively gait right into the car, a distance of about fifteen feet. The car was leaving the curve when Culbertson reached for the whip and appeared to be in danger. The gripman was looking for the place to make the "let-go." Culbertson drove to the north and seemed to try to beat the car to the point of accident, but failed. The distance between the car and the buggy when Dunlap first saw the situation was about forty-five feet, and the whole of the car had not passed the telegraph pole when it was stopped. He saw nothing west of the track to prevent Culbertson turning there. The time occupied by the car in going from the point where the "let-go" is to the Ninth street track is about nine tenths of a second, the cable running about nine hundred feet a minute. Witness thought it was about twenty-two feet from the "let-go" to the point of the accident, but the front of the grip car is about eleven feet in front of the place where the gripman stands. There is a space of about from five to ten feet in which the "let-go" must be made in order to make the crossing.

Cornelius Cronin, a policeman, was stationed about twelve feet north of the junction near the telegraph pole and did not see Culbertson until after he

had passed over the Ninth street tracks and the car was then about twenty feet away. Culbertson was driving right toward the car and attempted to get away from it by driving down the east side at a lively gate; the whole thing happened quicker than it would take one to tell it.

J. W. Overholtzer was the conductor of and on the rear end of the Ninth street cable which was going east, and saw the entire accident. The Ninth street train had just passed over the defendant's track and stopped, and he heard some one hallooing, and at the same time saw the defendant's train coming. Culbertson was driving slowly at first but when he noticed the car coming he slapped his horse excitedly with the lines, picked up his whip and tried to rush past on the east side of the track and to beat the car through the narrow space between the track and the telegraph pole. There was nothing in the way on the west side of the track. Culbertson was within about twenty-five feet of the car when he whipped up his horse.

Alfred Cochran was standing near the telegraph pole at the time of the accident and heard the bell of defendant's car. Looking, he saw that the car had just turned the curve; heard someone yell; saw the horse and buggy; yelled to Culbertson to turn to the left, but the latter paid no attention but struck his horse with the whip and seemed to want to go down the east side and beat the car while there was nothing on the left hand side to prevent his driving that way.

A. J. Akers upon the former trial testified that he had supervision over the crossing at Ninth and Delaware streets and saw defendant's train on Delaware street, and then saw a buggy with two men coming north. The gypsyman first threw the lever or "gypsy" which depresses the cable, and signaled the defendant's car with a white stick which he used for that

purpose, but did not flag the buggy to come across. There was a Ninth street car standing at the Junction, going east. Culbertson drove around the rear end of that car, north on defendant's track, and the witness thought he was going to cross over to the west side of Delaware street. As Culbertson came up, the gypsy-man or flagman yelled at him to get off of the track and tried to ward him off with his club toward the west. Culbertson paid no attention but came right along the defendant's track and encountered the watch-man, who tried to waive him off, and then the witness yelled at him, as he was standing a little further north still, and about that time Culbertson urged his horse on and ran right into the place of collision.

Fred Looney was the man who attended to "the gypsy" which depresses the cable in order to let defendant's cars cross the Ninth street tracks. He is the man that plaintiff claims was the defendant's sole watchman at the Junction. He says he signaled the car when it was north of the curve and gave no signal to Culbertson. He first saw Culbertson when the horse dashed by him and struck at the horse with a stick and yelled "Pull over to the left." Culbertson paid no attention, whipped up his horse and drove north into the narrow space where the collision happened. Witness looked before signaling defendant's car and the track to the south was then clear. There was a Ninth street car going east standing at the Junction and Culbertson must have come from behind that car. Witness tried to stop Culbertson, but did not have time to stop the car before the collision occurred.

J. W. Stewart was the conductor of defendant's train and was a few feet from the front end of the coach, which was an open or summer car. He was collecting fares of passengers and heard someone yell, looked up and saw Culbertson about thirty feet in front

of the car as it was then rounding the curve. After
rounding that curve there was not much time to act.
The gripman took his lever with both hands and went
over with it and made the throw, which was the only
way to do it, and came up holding his brakes. Cul-
bertson whipped up his horse and drove right onto the
car.

C. H. Mosely was the gripman on defendant's car.
He says there is a "let-go" just after the train gets out
of the south end of the curve, and a space of only four
or five feet where the let-go can be made. What is
known as a "grip-trap," marks the place of the let-go.
A gripman when he gets in the curve must keep his
eye on the grip-trap in order to make the let-go at the
proper place. Otherwise, a severe accident may occur.
When he was just about through the curve he heard
someone yell and glancing up saw the horse and buggy
right in front of the car, when over with his lever,
made his throw for the let-go and came up with his
brake set. The thing was all over then—the accident
had occurred. If he had not made the let-go, what is
known as the "throw-sheave" would have been injured,
the machinery broken and the train wrecked, injuring
the passengers thereof. Witness had been looking for
the grip-trap when he glanced up and saw Culbertson.
The horse and buggy dashed right in front of the grip
car, although before that he had kept his eye on the
track toward the south after getting the signal and saw
nothing between the train and the crossing.

Section 699 and 844 of the Revised Ordinances of
Kansas City were offered providing that no person
should drive upon the streets at faster than a moderate
gait, or in such a manner as to come in collision or
strike any other object or person, and that street cars
should at all times be entitled to the track and that

the driver of every vehicle on the track shall turn out so as to give the street car unobstructed passage.

John Peterson saw Looney on the day of the accident; was working with him at the time, and says that Looney was not intoxicated; he also says that Akers and Looney had some time previously to the trial had some trouble, and there was some feeling between them.

A. J. Johnson was a watchman at the Junction at the time of the accident, and saw two men coming down the street in a buggy; that the watchman who attends the gypsy threw it, put his foot on it and signaled defendant's train; that just about that time Culbertson came along in the buggy, and the watchman there and others yelled at him to stop and get out of the way, and as he drove by the gypsyman the latter struck at his horse and tried to turn it to the left or up Ninth street. Just as this was done Culbertson whipped up the horse and drove right on down to the point of collision. Culbertson had plenty of time to turn out of the way; he could have seen the car coming, and the witness thought that he must have seen it.

W. F. Guion, a newspaper reporter, was standing in front of the Burlington ticket office; saw Culbertson and Brent come down Main street and stop before crossing the Ninth street tracks and until a car on that line passed east. As soon as that car passed Culbertson drove right down on the crossing without a signal, and as soon as he reached the crossing the gypsyman attempted to stop the horse, and other watchmen and flagmen began to yell to attract his attention to the danger he was in. Culbertson could easily have turned to the west and gotten out of danger. However, he whipped up his horse, which dashed ahead into the place of collision. The gripman was ringing his bell

and tried to stop as soon as the danger became apparent.

E. C. McVey, a traveling salesman, was seated on the gripcar by the side of the gripman, says the car was signaled to come ahead, and just after the train started he saw the buggy right on the track ahead of him; that Culbertson drove out from behind the car on the Ninth street track suddenly, and the gripman tried to stop the car at once, and made the quickest stop he ever saw.

S. M. Calloway witnessed the accident from a buggy on west Ninth street; saw Culbertson before he reached the Ninth street tracks; says they were driving in a trot then and immediately thereafter started up faster; saw no signal given them to cross; that the gypsyman grabbed at the horse as it went by and the watchman yelled; that Culbertson could have turned east or west when on the Ninth street tracks, but did not seem to notice defendant's train until he got onto the Ninth street tracks, and when first seen the grip car was past the curve. The car was stopped very quickly by the gripman.

The instructions will be noticed in the opinion and the discussion of the case.

I. There was manifest error in admitting in evidence in behalf of plaintiff section 701 of the Revised Ordinances of Kansas City, which reads: "Section 701. In all cases where persons meet each other in vehicles in any street, avenue, alley or other public place in this city, each person so meeting shall turn to the right of such street, avenue, alley or other public place, so as to enable such vehicles to pass each other without collision."

To its introduction defendant strenuously objected at the time. This ordinance in the very nature of things is only applicable to those persons who are driv-

ing in vehicles which are free to move to the right or left as occasion may require and not to street cars running in grooved tracks or on fixed rails and which can not be moved from these fixed tracks without great danger to passengers therein and to the car itself. The ordinance would be absurd if it was intended to apply to railroads.   Booth on Street R. R., sec. 302; *Spurrier v. Cable Railroad*, 3 Wash. 659; *Hegan v. Railroad*, 15 N. Y. 380.   This much counsel for plaintiff concedes now, but urges that it was not introduced for such purpose, but was introduced to show deceased was in the exercise of ordinary care in driving to the right. We are not impressed with this reasoning.   The effect of the evidence was obvious.   It said to the jury that plaintiff's husband was in the exercise of care and obeying a positive ordinance in driving to the right when in fact that ordinance was wholly inapplicable to the case.   It could not possibly throw any light on the conduct of deceased in driving to the right at that point.   It was his duty to get off of the track, as the cars had the right of way, and it was a matter of no concern whether he went to the right or to the left if there was sufficient roadway on both sides. · The point wherein he was charged by defendant with gross contributory negligence was that seeing there was not sufficient roadway between the tracks of defendant and the elevated stone sidewalk on the right, he recklessly attempted to beat the car through this narrow passage and the effect of this evidence was to justify him in going to the right instead of the left which offered a safe roadway.   Especially hurtful was this evidence in view of the testimony of Brent that "deceased drove to the right because the law says he shall go to the right."   Nor was the error cured by the eighth instruction. · The office of that instruction was to inform the jury that another ordinance required Mr. Culbert-

son when driving on the tracks of defendant to turn aside at the approach of a car so as to leave the track unobstructed. It nowhere undertakes to withdraw this ordinance 701 or any other evidence in conflict with the eighth instruction. Considering that this section 701 was admitted over the specific objection "that it does not apply to street railroads laid along the street for the reason that the car can not turn to the right or left," and that its effect was necessarily harmful and that it was not explicitly withdrawn from the jury by a timely instruction, it must be ruled reversible error.

II. Error is assigned in permitting plaintiff to prove not merely that Looney, the man in charge of "the gypsy," was under the influence of liquor at the time he gave the signals for the train to move south over the crossing, but to go further and show by Akers that Looney was a man addicted to drinking intoxicating liquors and that he, Akers, had notified the division superintendent of this habit of Looney's. To properly understand the objection to this evidence reference must be made to the record. It is there disclosed that Akers was asked as to whether Looney was sober or intoxicated and he answered he was a man that drank more or less, some days more than others; that he was on this day "under the influence of liquor;" that he had talked with the superintendent Graves about "Looney being a drinking man." On cross-examination he admitted he never saw Looney take a drink. Did not know whether he took more than one drink on that day or not. Only knew by smelling it on him. Stated no other facts tending to prove intoxication. Evidence of intoxication which unfits one for his duties is competent in some cases in investigating whether his acts are negligent or not. The mere habit of taking an occasional drink can not, however, be regarded as any evidence of intox-

ication in the practical administration of justice, whatever abstract theories physiologists may advance on this subject. The evidence should and must go further and show that the liquor affects the particular individual in such a way as to incapacitate him to some extent to attend to his duties. In this case no such evidence was offered. It was left to the speculation and imagination of each juror to surmise how much liquor Looney drank on that day and how much influence it had over him at the moment of the giving of the signal to cross. Indeed it is difficult to see how it was at all material. It was certainly immaterial whether he was drunk or sober if he was negligent in directing the car to move over the crossing when he did. If he was negligent the company is liable whether he was drunk or sober. There is no dispute whatever about his giving the signal and how could it affect defendant's liability that he gave it while "under the influence of liquor." Had there been any question whether he signaled the train to come on and the surrounding facts were not known, proof that he was so drunk as to be incapable of properly discharging his duties might have been introduced from which inference of negligence could be drawn. But that is not this case. Brent swears that Looney gave the signal and that he and others understood it was intended for Culbertson to drive on. Looney admits he gave it but says it was for the car to come on. Whether it was a negligent act so far as defendant is concerned depends not on whether he was drunk when he did it, but whether the signal in view of all the surroundings and attendant circumstances was a negligent act irrespective of his intentions or condition. The nature of his act as already said must be adjudged by the relative positions and distances of the cable car and the buggy of deceased from each other; the speed at which they

were traveling and whether a reasonably careful driver in charge of the buggy could have safely crossed the Ninth street tracks to the west side of Delaware street after the signal was given the car to make the crossing. These facts must have determined the prudence or negligence of the act and not the physical condition of Looney at the time. Doubtless there are many cases in which it would be a strong circumstance tending to prove negligence, but upon the admitted facts of this case and from plaintiff's own standpoint we can not see how the previous habits of the "gypsyman" would elucidate the facts in issue. We can see, however, how they might easily prejudice the jury against the defendant. *Warner v. Railroad*, 44 N. Y. 465; *Railroad v. Randall*, 11 S. E. Rep. 706; *Railroad v. Colvin*, 32 Am. and Eng. R. R. Cases, 160–163.

III. The proper hypothetical question was not asked Trueblood. The place in controversy or the grade at this point and the other conditions existing there were not incorporated in the question. The witness, without any qualification, was permitted to state within what distance a train could be stopped. In what distance a train under ordinary circumstances could have been stopped is one thing and a very different thing within what distance this train could have been stopped, due regard being had to the safety of the train in making the "let-go" and of the safety of the passengers, at this particular place and under the peculiar circumstances after the gripman discovered Culbertson was trying to pass on the east. As to these particulars he had not qualified himself. A service of five or six months only in working on another cable line was hardly sufficient of itself to enable the witness to testify intelligently without more details as to facts surrounding this case. And as a matter of fact

his evidence is quite different from that of other witnesses on this point.

IV.   Among other instructions the court gave the following for plaintiff:

"6.   If the jury shall believe from the evidence in the case, the flagman, stationed at the crossing near which the plaintiff was injured, signaled Culbertson to go over said crossing, then said Culbertson had the right to presume the train of defendant would not move over the crossing while he was diligently complying with the invitation of said flagman, and if you find that said Culbertson was so invited to go over said crossing, then no negligence can be imputed to him in his attempt to go over, unless the danger of so attempting to go over at that time was so imminently and obviously apparent that no prudent person would have attempted so to do."

The principal vice in this instruction is that notwithstanding the evidence greatly preponderated against plaintiff's claim that the flagman signaled her husband to pass over the crossing but on the contrary made strenuous efforts to prevent his doing so by warning him and attempting to drive his horse back and urging him to the left instead of the right, the court tells the jury that Mr. Culbertson had a right to presume the cars would not move over the crossing while he was diligently complying with such invitation.

This matter occurred in broad daylight on an open street; the cars were in full view of deceased had he looked in the direction he was driving, but counsel for plaintiff and her witnesses say he was *"oblivious."* This court has time and again condemned the giving of an instruction indulging such a presumption in a case where the evidence was so conflicting.   Besides it is not the law that a traveller, especially an adult, as in this case, laboring under no disabilities, can disregard

all the laws of prudence himself and blindly trust the street railway companies to take care of him, and to observe all the requirements of the law and ordinances. Whether deceased was guilty of contributory negligence on the one hand and the defendant of negligence on the other were questions of fact for the court and the jury. Railroad tracks are places of danger though trains are run thereon under the most careful observance of the strictest regulation, and a traveler approaching such a track is bound to use reasonable care to look out for cars before attempting to cross, and it is only when he himself is in the exercise of reasonable care for his own safety that he has the right in the absence of information to the contrary to rely upon the presumption that the company in charge of the cars will perform its duty and observe the requirements of the law and ordinances. This instruction required no exercise of prudence whatever upon the part of deceased and counsel for plaintiff by insisting he was *oblivious of the coming train* seem to concede that he was exercising no care for his safety. Such an one can not invoke the presumption of compliance with duty on the part of others. The rule of contributory negligence is not changed or abrogated by reason of a statute or ordinance imposing the duty on account of a violation of which the injury results. *Weller v. Railroad*, 120 Mo. 635; *Lynch v. Railroad*, 112 Mo. 420.

There is another serious objection to this instruction. It is this: It impliedly assumes that the accident was caused while deceased was making the crossing when in fact he made the crossing safely and the sole cause of his injury was that he turned to the right and drove into the narrow passage between the tracks and the sidewalk on the east of the street and to use the language of plaintiff's brief "from a review of all the huge mass of testimony, it will be seen that the

whole case was predicated upon the negligence of the gripman as the proximate cause of the injury."

This being so, there was no good reason for plaintiff praying an instruction as to the crossing, nor for the court giving it, if the case depended entirely upon the subsequent actions of deceased and the gripman. The crossing was safely made, and there was ample room and time for deceased to have driven to the west and have avoided all danger of collision.

Granting that the signal was to Culbertson, it was in no sense an invitation to him to drive to the right, and into a dangerous defile when he could as readily have driven to the left out of danger.

V.   Plaintiff's third instruction should have been modified to the extent of qualifying the duty of the gripman to keep a constant lookout by informing the jury that he had also the paramount duty of using every reasonable precaution for the safety of the passengers on his car and that if deceased rapidly and unexpectedly approached the car at the moment the gripman was making the "let-go" and when his attention was necessarily directed to that important and essential duty, such a momentary diversion of his attention was not negligence on the part of the gripman.   The two duties are consistent.

VI.   The court in its first instruction required the jury to render a verdict for the absolute penalty of $5,000 if they found defendant was guilty of the acts or omissions set out (in said instruction), *that such act,* or acts or omissions, on the part of the defendant, its agents, servants or employees, so found to exist, was carelessness and negligence which directly contributed to said Culbertson's death and that he was in the exercise of ordinary care.   Defendant challenges this instruction because it fixed the verdict arbitrarily at $5,000.   The acts specified in the instruction included

negligence "in failing to employ capable watchmen" and "in failing to have a sufficient number of watchmen at the junction in question," and then "negligence in the gripman in operating the train." Now negligence in employing incompetent flagmen, and in not having a sufficient number of competent flagmen, is not "negligence in operating the car or train," and in such cases the verdict is not fixed at $5,000 but the jury may give a sum not exceeding $5,000. It has been uniformly ruled in this State that where different acts of negligence are alleged and relied upon and some of them bring the case within the penalty clause of section 4425 and others bring the case within section 4426, it is error to instruct solely for the penalty. *Crumpley v. Railroad*, 98 Mo. 34; *King v. Railroad*, 98 Mo. 235; *Rapp v. Railroad*, 106 Mo. 423.

VII. We have responded to the very able and exhaustive briefs of counsel for appellants on the foregoing points, but it seems to us that the last proposition that the demurrer to the evidence was erroneously overruled is well taken. Before driving upon the Ninth street crossing Culbertson, the deceased, had he looked, could have seen the train approaching from the north. According to Mr. Brent, who sat in the buggy with him, they had passed safely over the Ninth street tracks, and were immediately upon defendant's track going north. When the hind wheels of Culbertson's buggy had just passed, or were yet on the north rail of Ninth street track, it is certain that Culbertson then saw the train was approaching. Instead of turning to the left of defendant's tracks, which would have required an immeasurably short time, he seized his whip and lashing his horse plunged quickly forward to his right with the intent of beating the approaching car through the narrows between the track and the sidewalk. The horse was shown to be gentle and readily handled.

All this time as Culbertson knew the train was moving south to the crossing with the bell ringing. In two seconds the buggy had collided with the cars.

There is no evidence that the gripman did or could have seen Mr. Culbertson prior to the buggy coming on the track north of the Ninth street line, nor would ordinary care demand he should do so.

The theory upon which the recovery is sought is that the gripman did not exercise care to prevent injury to deceased after discovering him in peril. As to this the evidence does not show the gripman knew or antici-pated deceased would attempt to go to the right when he first saw him at the crossing, and that receiving the signal which governed his movements he put his car under full headway to make the crossing and kept his eye along the street for the plate over the "let-go." Making the "let-go" successfully he raised his eyes when all the evidence indicates he, for the first time, discovered deceased rapidly approaching from the east side, and the proof is uncontradicted that the train was stopped opposite the buggy by the rapid and success-ful action of the gripman. To hold the gripman to a higher degree of care than was here exhibited would be utterly unreasonable, but if he had been negligent in not stopping sooner, we think the whole evidence shows a clear case of contributory negligence on the part of deceased in attempting to beat the cars beyond the narrow roadway by rapid driving to the right and that this conduct of deceased was the proximate cause of his death.

In view of all the facts we simply reverse the judg-ment. SHERWOOD and BURGESS, JJ., concur.