MINNIE R. BEBOUT, Curatrix of the Estate of JO ANN DAVIS, a minor, v. JAMES M. KURN and JOHN G. LONSDALE, Trustees of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellants.—154 S. W. (2d) 120.

Division Two, September 25, 1941.

*E. G. Nahler, Mann & Mann* and *Ray Bond* for appellants.

504

*Kelsey Norman, Alfred K. Lee* and *Henry Warten* for respondent.

 ELLISON, J.—Respondent's ward, Jo Ann Davis, six years old, was injured while riding in an automobile with her grandparents, Mr. and Mrs. Bowler and her aunt, when the same was struck by appellants' *westbound* passenger train, the Blue Bonnet, at a public road crossing in Strafford in Greene County, on September 11, 1937, about dusk. All the other occupants of the automobile were killed. The train had just passed eastbound passenger train, the Will Rogers. The latter train was moving on a side track and respondent's version is that the automobile, awaiting its passage, had stopped on the main track and was there struck by the westbound train. (Throughout, we shall designate the trains by their directions.)

Respondent recovered a judgment for $10,000. The cause was submitted on the humanitarian doctrine for negligent failure to stop the train or give an emergency warning. Appellants' assignments of error complain: that the evidence was insufficient to warrant the submission of the case to the jury; of the improper admission of evidence; and of the giving of respondent's instructions 1, 2, 3 and 6.

 Strafford is on U. S. Highway 66, which parallels the railroad tracks about eighty feet north of the main track. The passing track is south of the main track. Two gravel roads lead off to the south from Highway 66 and cross the railroad tracks. One, called the west road, is 350 feet west of the depot. Viles filling station is at the intersection of that gravel road with Highway 66, about 130 feet north of the main railroad track. A railroad tool shed is on the right of way 295 feet west of the west gravel road crossing, and the passing track comes off the main line some distance further west. The other gravel road, called the east road, is 460 feet east of the depot. The passing track rejoins the main line 2400 feet east of the depot, where there is an electric block signal. Beyond that some distance is a caution block signal. The track is slightly up grade to the east for 1320 feet from the depot. From a point on the west gravel road fifty feet north of the main track a pedestrian could see a westbound train for 500 feet, and from a point twenty-five feet north of the track for more than 1320 feet. The enginemen on the train could see an automobile on the track for more than half a mile.

The Bowler automobile had been at the Viles filling station, headed east. It drove out as much as 100 feet, one witness thought, in making a turn south onto the highway. Thence it proceeded west to the inter-

section and again turned south off the pavement onto the west gravel road, and continued to the railroad track. The whole distance traveled was 350 feet or less, which would take twelve seconds or less at twenty miles per hour. Mr. Viles and two other persons at the filling station heard but did not see the collision, and estimated it occurred about two minutes after the automobile left. One of them saw the eastbound train, or some part of it between the tool house and the highway crossing. George Turnipseed, also at the Viles filling station, saw the automobile leave and stop when it got to the railroad crossing. It waited a minute or two without moving until the westbound train struck it. When the car came to a stop the eastbound train had the crossing blocked, or the engine was about at the crossing. He saw the engine of the oncoming westbound train about at the depot 350 feet east an instant before the collision.

Louise Comstock and her sister Catherine, eighteen and fourteen years old at the time, were in an automobile going north on the west road. They stopped on the *south* side of the track. The front of the eastbound train was then near the tool house 295 feet west. (At a former trial Louise had said it was only ten feet away.) The Bowler automobile, traveling south, drove up and stopped on the north side of the tracks. The train by that time was about at the crossing. As it went on over they could see under it the lighted headlamps of the Bowler automobile. It did not move. Just after the eastbound train had cleared the crossing, the engine of the westbound train hit the automobile. The undisputed testimony is that it was thrown *south* of the main track. This was the eyewitness testimony for respondent concerning the movements of the automobile, the elapsed time and the collision.

For appellants, witness Miner testified that from his yard across from the Viles filling station he saw the Bowler automobile leave the station and proceed to a point about fifteen feet north of the main track, and stop. At that time the eastbound engine was about half way between the tool house and the crossing, which would be about 147 feet. He could see the headlight. He also heard the whistle of the westbound train and saw the headlight shining on the track and depot, which means the train was still beyond the depot 350 feet east of the west crossing. But he went in the house and saw nothing more. Douglas Potter, at a point on Highway 66 north of the depot, saw the Bowler automobile fifteen or twenty feet from the railroad track and it was moving. The engine of the westbound train was about fifty feet east of the depot, or 400 feet from the crossing. The engineer said he first saw the automobile as his locomotive was passing the depot. It was very close to the track and moving upon it. The fireman said the locomotive was 200 or 300 feet from crossing when he saw the automobile and that it appeared to be standing.

The eastbound train had eight cars, and was about 750 feet long. It

had stopped 1320 feet west of the west crossing to be switched over to the passing track. And since there was no mail crane on that track, it had to run slowly by the depot to discharge and receive mail pouches, which latter the agent threw into the mail car door, that being the third car. Before that, one witness said, it was going ten or fifteen miles per hour, and it increased its slow speed afterward. But the fact is conceded that the train was not moving more than five to seven miles per hour in preparation for and while handling the mail. After that operation it proceeded on up to the east end of the passing track a little over 2000 feet to be switched back onto the main track.

The westbound train had eleven cars and was about 950 feet long. The engineer testified its regular speed was about 70 miles per hour. When he approached the first block it signaled caution, so he reduced the speed of the train to about twenty miles per hour. The block signal at the east passing track switch was red, indicating the eastbound train then entering the west end of the passing track had not yet cleared. But before he got to it it turned green. He accelerated the speed of the train and was going maybe forty-five miles per hour when the engine passed the depot. There was a semaphore at the depot which was not automatic but manipulated by the telegraph operator. It, also, was clear. As already stated, he first saw the Bowler automobile about on the west crossing when he was ▮▮▮▮ passing the depot. He set the emergency brakes when the engine was just past the depot, 250 or 300 feet from the crossing and stopped the train in 950 or 1000 feet.

The engineer was corroborated as to the speed of the train opposite the depot—forty to forty-five miles per hour—by the fireman, mailman, station agent and witness McDowell, a resident of Strafford. Two witnesses for respondent estimated a slower speed. Mr. West, who was north of the track at the east road (over 460 feet east of the depot) thought the train was going about twenty miles per hour there. Witness Choate was on the station platform a little east of the depot and estimated the train was traveling twenty-five or thirty miles per hour then. After the *rear* of the train had passed the depot about fifty feet he saw sparks fly from the wheels.

Respondent's expert witness Toles and two engineers and a brake instructor for appellants, named Moore, Ellis and Davies, respectively, gave opinion testimony as to the distances in which the train could have been stopped by an emergency application of the airbrakes at different speeds. Appellants' experts also had performed experiments with technical equipment on a comparable train. We show the distances in feet tabularly:

| Miles per hour | Toles | Moore | Ellis | Davies | Experiments |
|---|---|---|---|---|---|
| 20 | 275-325 | 300 | 275-300 | 300-350 | ...... |
| 25 | ...... | 400-450 | 300-350 | 400-450 | ...... |
| 25-30 | 350 | ...... | ...... | ...... | ...... |
| 30 | ...... | ...... | 400-450 | ...... | ...... |
| 36.75 | ...... | ...... | ...... | ...... | 632 |
| 40 | 400-425 | 650 | ...... | ...... | ...... |
| 45.5 | ...... | ...... | ...... | ...... | 979 |

But the three witnesses for appellants further said they would not guarantee the safety of passengers if a stop were made in the distances they gave for twenty and twenty-five miles per hour, especially the former. Passengers might be thrown out of their seats, or knocked down if standing; and dining car equipment would be disordered. They explained a full emergency application is more violent at slow speeds because the train lacks momentum to break the shock. Still they said they would use it to save lives or greater danger ahead. Respondent's witness Toles said it would take two seconds, and later two and one-half to three seconds, for the brakes to operate effectively throughout the train; appellants' expert said three seconds, and it might be three and one-half seconds on an eleven car train. In the experiments at thirty-six and seventy-five-hundredths miles per hour it took eighteen and six-tenths seconds to stop the train with no substantial reduction in speed the first four seconds. At forty-five and five-tenths miles per hour it took twenty-three and one-tenth seconds with about the same delay in effective action.

It will be seen Toles' testimony as to the 300 feet distance in which the train could be stopped going twenty miles per hour did not differ from that of the three railroad witnesses; and his estimate of 350 feet for twenty-five miles per hour was about the same as Ellis'. Respondent's witness Turnipseed located the westbound engine at the depot 350 feet east an instant before the collision. The engineer and fireman first saw it from a little shorter distance. Appellants' witness Miner saw the headlight rays of the westbound engine shining from an undetermined distance east of the depot after the automobile had stopped, as he thought about fifteen feet from the track. Appellants' witness Potter saw the automobile fifteen or twenty feet north of the track and thought it was still moving. The locomotive was then about fifty feet east of the depot, or 400 feet from the crossing. The engineer could have seen the automobile for a quarter of a mile. So, under the expert testimony most favorable to the respondent, the jury were warranted in finding the train could have been stopped in time to save the occupants of the automobile if it had been in danger long enough to be seen, and the train was running twenty or twenty-five miles per hour.

Though witness Potter and engineer Moore said the automobile was moving, Turnipseed, the Comstock girls and the fireman said it was not. If this be true it stopped where it was hit. How long had it been there? According to the testimony of the Comstock girls the eastbound train was near the tool house 295 feet west of the crossing when they first saw it. Witnesses Viles and Miner saw it between the tool house and crossing. This caused the Bowler automobile to stop, perhaps substantially before the train reached the crossing—though Turnipseed and the Comstock girls said the engine was *about* at the crossing when the car stopped. But however that may be, Turnipseed said the automobile remained standing for a minute or two before the collision. The eastbound train was 750 feet long and part of it was west of the crossing while running the slowest. It at least traveled its own length and the twenty-five foot width of the highway in clearing. It was moving five to seven miles per hour according to nearly all the testimony, although one witness, Mullinax, said ten or fifteen miles per hour until it slowed up for the mail. At the five-mile speed it would have taken one minute forty-two seconds to get across, and at the ten-mile speed fifty-three seconds, which was close to Turnipseed's estimate. The jury could well have found the automobile stood at the crossing a minute or more.

As to the speed of the westbound train. In addition to the testimony of witness West that it passed him about 460 feet east of the depot going twenty miles per hour, and the testimony of witness Choate that it passed him a little east of the depot going twenty-five to thirty miles per hour, respondent also submits calculations. It is undisputed that the engines of the two trains passed each other about 100 feet east of the east road, which would be 560 feet east of the depot. Since the eastbound train was 750 feet long, its rear then must have been 190 feet west of the depot. The engineer of the westbound train and the brakeman on the eastbound train both testified the locomotive of the former passed the rear of the latter opposite the depot. This means the westbound engine traveled the 560 feet to the depot while the rear of the eastbound train was closing the 190-foot distance to the same point. In other words the westbound train ran almost exactly three times as far and fast as the eastbound train. And if the latter was going five to seven miles per hour the speed of the former was fifteen to twenty-one miles per hour.

If the above testimony be true concerning the points where the westbound engine passed the front and rear of the eastbound train, it establishes the *ratio* of the *mean* speeds of the two trains. Bear in mind also that the mail car was the third car of the eastbound train, so 250 feet of it was east of the depot, leaving only 310 feet to the passing point of the two engines. Conceding it increased its speed, the average could not have been raised much in that distance. Another bit of testimony is this. Brakeman Haddock was riding on the

rear steps of the eastbound train. He said when he had reached the east crossing his attention was called to the collision of the westbound engine and the automobile at the west crossing, and he saw the resulting dust. He had just passed that engine at the depot. From there it was 460 feet to the east crossing and 350 feet to the west crossing. According to that, he had traveled further than the westbound engine in the same time. Of course he was mistaken, but it indicates the westbound train was not going very fast, or had been retarded far more than appellants' experiments indicated was possible.

Considering all the foregoing evidence in the view more favorable to respondent, we think the jury had a right to infer: that the automobile was standing on the main track for a minute or more, blocked by the passing eastbound train and in a position of apparent peril, during which time the westbound train was bearing down on it over a distance of 1764 feet—at a speed of twenty miles per hour; that the engineer could have seen the automobile through all that distance, and certainly for the 910 feet between the west crossing and the point where the two engines passed thereby relieving him of the glare from the headlight of the eastbound engine; that the westbound engine could have been stopped in 350 feet if traveling twenty to twenty-five miles per hour; and that it was not traveling in excess of that speed. Respondent's eyewitness testimony, and the computation arriving at the last conclusion by comparison with the speed of the eastbound train, are supported by the facts that the eastbound train was on a passing track and had run slowly to take on mail; that it had to stop 2400 feet east of the depot to be switched back onto the main track; that brakeman Haddock was riding on the rear steps, doubtless partly for that reason; that no member of the train crew on that train testified to its speed; that the crews of both passing trains had to note the number of the locomotive on the other for the purpose of identifying it and verifying the passing order; that the two trains were passing each other and a depot with a semaphore controlling their movements; and that they were running through a village with two highway crossings. We hold the respondent made a prima facie case on the humanitarian duty to stop the train.

■ The cause was also submitted on the failure to sound "emergency" warnings. Appellants contend there was no evidence as a matter of law, of failure to give an adequate warning; and that an emergency warning would have done no good. There was ample evidence from appellants' witnesses, including townspeople, that the westbound engine did whistle repeatedly going into Strafford, as far as the depot—for the station, for the train it was meeting, ■ and for both crossings. These were not emergency warnings—short toots —but they were as loud and protracted as the latter would have been.

On the other hand respondent produced seven witnesses who were within hearing distance and did not hear the train whistle. On cross-examination four of these admitted they were busy or not paying attention and that the train might have whistled without their hearing it. But two, who were eyewitnesses, were not cross-examined on that point, and their statements were left standing unchallenged.

The remaining witness, C. L. Nicholson, conductor of the westbound train, was the most important of all. *Respondent* had called him to the stand. He said that when his train went through Strafford he was in the front vestibule of the front car—a deadhead Pullman *next to the engine.* On cross-examination he stated that when the train passed the eastbound train he was on the south side of the vestibule where he could see it. Then he changed to the north side to see if the depot semaphore showed clear. Following that he described the customary whistling for the station and for the east crossing. But when asked if he heard such whistling on the occasion of the collision he answered that he did not hear either. Then counsel for appellant asked: "You were inside, and you weren't paying any attention," to which he answered "No." But being right behind the engine on the front vestibule of the first car, and charged with the duties of his position, we think the jury might well have believed that if the engine did whistle he would have heard it. Considering the testimony of these three witnesses, appellant made a case for the jury on this issue.

Appellants say emergency warning signals would have done no good, and therefore the failure to give them was not a proximate cause of the casualty. This contention is based mainly on the theory that the crossing signals sounded continuously over nearly 160 rods were just as good, citing Blackwell v. U. P. Rd. Co., 331 Mo. 34, 42, 52 S. W. (2d) 814, 816(3). But as we have said, there was substantial evidence that the latter were not given, and if the jury so found then the emergency signals were all the more necessary. Appellants further insist this assignment of negligence was inconsistent with the other—failure to stop the train—because the latter was predicated on the idea that the occupants of the automobile were helpless and could not escape; and if that was true it would have been unavailing to give emergency warnings. Conversely, if the warning signals would have sufficed there was no need of stopping the train. We cannot subscribe to this reasoning. It may be inferred that if warning signals had first been given Mr. Bowler could have backed the automobile off the track; and the failure to give them was what made necessary the stopping of the train; or the occupants of the automobile might have jumped out and saved themselves, even after stopping was impossible. It was appellants' duty to use any and all

prudent and pleaded means at hand necessary to avert the casualty. [Banks v. Morris & Co., 302 Mo. 254, 267, 257 S. W. 482, 484(2).]

The next assignment is that the evidence failed to show respondent's witness Toles was qualified as an expert, in consequence of which he was not competent to give opinion testimony on the distance within which the train could have been stopped at given hypothetical speeds by use of the emergency brakes. He had never been a locomotive engineer, but had had some forty-four years' experience in railroad work. He worked for one road from 1905 to 1935, when he was retired. During the last five years of that period he was brakeman in the passenger service, and for the twenty-five years preceding had been both rear and head brakeman in the freight service, riding on the engine in the latter capacity. During the five years of his passenger service he had "spotted" locomotives and run trains back and forth in the yards pretty nearly every day for three or four years. He had made emergency applications of the brakes on both passenger and freight trains, with more than eleven cars on the latter, in yard movements. Before 1905 he worked for another road as a fireman for two years. Preceding that he had fired locomotives all over the country, but had done no such work since 1905. This was in the freight service. He said he knew in what distance an eleven-car passenger train of ordinary, standard coaches, baggage cars, Pullmans and engine, with good air brakes, could be stopped at different speeds.

Was such a man qualified to testify as an expert on the issue in this case where the equipment was similar? It is said such questions rest largely in the discretion of the trial court, (Ambruster v. Levitt Realty & Inv. Co., 341 Mo. 364, 375, 107 S. W. (2d) 74, 80); and that the expert must possess knowledge from education or experience which will aid an ordinary jury in forming an opinion on the subject matter of the inquiry, when from common experience they could not do it correctly. [Homan v. Mo. Pac. Rd. Co., 334 Mo. 61, 79, 64 S. W. (2d) 617, 625; Robison v. C. G. W. Rd. Co. (Mo. App.), 66 S. W. (2d) 180, 185(7).] The ruling in Irwin v. St. L.-S. F. Ry. Co., 325 Mo. 1019, 1027, 30 S. W. (2d) 56, 58, was that a proffered expert witness, who had been a railroad man for thirty-five years mainly in office and administrative positions and for a short time as a fireman, lacked the necessary qualifications to testify as an expert on the time required for the effective application of air brakes. A somewhat more liberal view was taken in Hiatt v. Wabash Ry. Co., 334 Mo. 895, 907, 69 S. W. (2d) 627, 632, where this court inclined to the conclusion that a witness was competent to testify as an expert that a work train equipped throughout with air brakes would stop smoothly whereas one not so equipped would jerk. The witness had observed trains of both kinds off and on for four years,

but had never operated a train though he had ridden on them. Other cases relied on by appellants are cited in the margin.*

In our opinion Toles was qualified to testify as an expert; at least we are unable to say the trial court abused its discretion in permitting him to do so. He had had operating experience on locomotives for many years, and said he had actually made emergency stops and witnessed others. His lack of experience as an *engineer* may have affected the weight of his testimony but not his competency, in view of the other facts. But even on the matter of credibility, it is to be noticed that his testimony regarding the distance in which the train could have been stopped at speeds from twenty to thirty miles per hour was substantially the same as that of part of appellants' witnesses except they said there might be some tossing about of passengers and dining car equipment. Yet even on that they agreed they would make the stop to save lives or greater danger; and certainly it would be for the jury to say whether this constituted an undue hazard to passengers and crew. It is to be noted also that appellants' counsel asked the opinion of the conductor and fireman of the westbound train as to whether the train was stopped as soon as it could have been by the use of the emergency brakes, thus indicating a view that trainmen in those lines of service would have expert knowledge on such matters.

We come now to the instructions of which appellants complain. Instruction No. 1 submitted the case and authorized a verdict on the humanitarian theory of failure to stop the train. Instruction No. 2 similarly submitted the issue of failure to sound an "emergency warning." The first criticism of both instructions is that there was no substantial evidence to support them. We have already ruled on that question adversely to appellants. The next criticism is that neither instruction required the jury to find the hypothesized negligence of appellants' enginemen was a *proximate* cause of the injuries sustained by the child. It is true they did not sum up with an express requirement that the jury find the child was injured as a proximate result of the failure to stop or sound the warnings, but we cannot think the jury was misled by that omission, especially in view of appellants' Instruction No. 11. However, both instructions should be rewritten with that point in mind, if there is another trial.

Appellants further complain of Instruction No. 2, because it predicated liability on a failure to give *emergency* warnings with the locomotive whistle although the evidence showed continuous *crossing* whistles had been sounded clear up to the depot. On authority of the Blackwell case, supra, 331 Mo. l. c. 42, 52 S. W. (2d) l. c. 816(3),

---

*Marshall v. K. C. Rys. Co. (Mo. App.), 205 S. W. 971, 973(6);
Lynch v. C. & A. Ry. Co., 208 Mo. 1, 39-40, 106 S. W. 68, 80(7);
Culbertson v. Met. St. Ry. Co., 140 Mo. 35, 59, 36 S. W. 834, 840(3);
Robertson v. Wabash, St. L. & Pac. Ry. Co., 84 Mo. 119, 121 (II);
Gourley v. St. L. & S. F. Ry. Co., 35 Mo. App. 87, 94.

they assert *any* adequate warning was sufficient, and that the crossing signals were the equivalent of emergency signals because they were as loud and protracted, though the latter would have been shorter blasts. The Blackwell case was founded on a Kansas casualty and did not involve our Missouri humanitarian doctrine. Under that doctrine an engineer must whistle "diligently" if other means of warning are ineffective. [Rollison v. Wabash Rd. Co., 252 Mo. 525, 538, 160 S. W. 994, 997(5); Perkins v. Term. Rd. Assn., 341 Mo. 868, 885, 102 S. W. (2d) 915, 923(14).] Furthermore, as already stated, there was substantial evidence for respondent that no whistles of any kind were sounded.

There were, therefore, two questions for the jury: (1) whether the longer whistles were ineffective as compared with short, sharp blasts; (2) and whether the crossing signals were sounded. If the first question were answered in the affirmative, or the second in the negative, then the warning signals should have been sounded if they could have been—provided the child was in peril but could have been saved, and the enginemen were or should have been aware of it. On that hypothesis respondent was entitled to an instruction on the issue. Appellants do not seriously dispute that, but they say the instruction should first have exacted a finding that no whistles of any kind were sounded, or in some way have conditioned the requirement of emergency signals on the absence of other adequate warnings. That might be true if appellants' defense on this issue had been affirmative, since the instruction directed a verdict and the issue was not submitted in any other instruction. [Pence v. K. C. Laundry Service Co., 332 Mo. 930, 939(12), 59 S. W. (2d) 633, 636(10).] But it was not affirmative and was interposed under a general denial. In that situation respondent was only required to hypothesize her own version of the facts. [Gately v. St. L.-S. F. Ry. Co., 332 Mo. 1, 19(17), 56 S. W. (2d) 54, 62(24).]

Respondent's short Instruction No. 3 declared that even though the jury found from the evidence the driver of the automobile was negligent in going and remaining on the railroad track, yet they could not impute that negligence to the child. Appellants say the instruction injected the contributory negligence of the driver into the case; and that contributory negligence was not a defense under the humanitarian doctrine. The latter proposition is correct. But the negligence of the driver was not *contributory.* That term refers to conduct for which plaintiff is responsible—his own or that of someone in privity with him (45 C. J., secs. 501, 573, pp. 942, 1019); and it is not claimed the six-year-old child here was responsible for the acts of her grandfather in driving the automobile.

The instruction is broad enough to cover the negligence of the grandfather if it was a *concurrent* cause or the *sole* cause of the collision—in which event, also, it would not be contributory. If it was

merely concurrent it was not a defense; if the sole cause, it was. But if the question had been raised, there would be reason for saying that insofar as the instruction covers sole cause negligence, it was error against appellants to charge the same could not be imputed to the child. We do not forget the contrary has been held, that a defendant's sole cause instruction *should* contain a clause informing the jury a third party's negligence cannot be imputed to the plaintiff—where there was no privity between them.* But the Peppers case, cited in the margin, was questioned in Mendenhall v. Neyer, 347 Mo. 881, 149 S. W. (2d) 366, 377, and the others have recently been modified in Stanich v. Western Union Tel. Co. (Div. 1), 348 Mo. 188, 153 S. W. (2d) 54, 59(4), and Shields v. Keller (Div. 1), 348 Mo. 326, 153 S. W. (2d) 60, 65(7). The first meaning of impute is "to set to the account of." [Webster's New International Dictionary.] And certainly if the negligence of a third party (not in privity with the defendant) was the *sole* cause of the casualty, that negligence can be set to the account of the plaintiff even in a humanitarian case, in the sense that it defeats his recovery. However, appellants here obtained an Instruction No. 11 containing the same error. It stated that though the negligence of the grandfather in driving the automobile "is not to be imputed to" the child, still if it was the sole cause of the collision she could not recover. We make this comment because the case may be retried.

The last assignment assails respondent's Instruction No. 6 because it mingled appellants' antecedent negligence with their negligence after plaintiff's (the child's) imminent peril arose, which cannot be done. The assignment is good. The rule and the reason for it have been stated time and again. In a humanitarian case the defendant is liable even though the plaintiff was guilty of contributory negligence—if he was in imminent peril and the defendant could have saved him by the exercise of due care. But it is manifestly unfair to apply the same doctrine *before* the plaintiff got into peril and while his contributory negligence would be available to the defendant as a defense. The instruction complained of told the jury, in substance, that the enginemen of the westbound train had █ no right to expect a clear track at the highway crossing, and were bound in law to keep a reasonably careful lookout for persons on, near or approaching the crossing; also that such lookout must have been kept *at such distance* from the crossing as a reasonably prudent person would have kept to ascertain whether persons were on, near or *approaching* the track. There is not a word in it limiting its application to persons in imminent peril. This was palpable error. [Several recent cases

*Peppers v. St. L.-S. F. Ry. Co., 316 Mo. 1104, 1114, 295 S. W. 757, 761; Millhouser v. K. C. Pub. Serv. Co., 331 Mo. 933, 941, 55 S. W. (2d) 673, 676; Watts v. Moussette, 337 Mo. 533, 539, 85 S. W. (2d) 487, 489; Dilallo v. Lynch, 340 Mo. 82, 92-3, 101 S. W. (2d) 7, 13.

516

on the point are: Reiling v. Russell (Div. 1), 348 Mo. 279, 153 S. W. (2d) 6; Chastain v. Winton (Div. 2), 347 Mo. 1211, 152 S. W. (2d) 165, 169(5); Buehler v. Festus Mercantile Co., 343 Mo. 139, 158(8), 119 S. W. (2d) 961, 970(11); Mayfield v. K. C. So. Ry. Co., 337 Mo. 79, 91, 93, 85 S. W. (2d) 116, 123 (6, 7), 124(17).]

For the error in respondent's Instruction No. 6 the cause is reversed and remanded. All concur.