THOMAS W. FAIR, ADMINISTRATOR OF THE ESTATE OF JOHN H. FAIR, DECEASED, AND FRANK FAIR, DECEASED, ET AL., RESPONDENTS, V. GUY A. THOMPSON, TRUSTEE OF THE MISSOURI PACIFIC RAILROAD COMPANY, APPELLANT.—212 S. W. 2d 923.

Kansas City Court of Appeals. May 10, 1948.

*Thomas J. Cole, Ragland, Otto, Potter & Embry, Leon P. Embry* and *Forrest P. Carson* for appellant.

*George H. Miller* for respondent.

·CAVE; P. J.—On January 7, 1946, ·John H. Fair and his brother, Frank Fair, were killed simultaneously when the automobile in which they were riding was struck by defendant's train at a certain railroad crossing in Pettis County. Both men were bachelors. Their brother, Thomas W. Fair, was appointed administrator of the estate of each, and filed suit, under our Wrongful Death Statute, Sec. 3652, R. S. 1939, ·for and on behalf of all their heirs. The petition was in two counts; in the first he sought to recover for the death of Frank, and in the second for the death of John. The petition charged, among other·things, humanitarian negligence in failure to warn and in failure to stop the train, and the cause was submitted to the jury on those two grounds of negligence. The answer denied negligence and pleaded contributory negligence, and also charged that there was an improper joinder of parties and of claims. The cause was tried to a jury and resulted in a· verdict and judgment against defendant for $2,000 on each count. Defendant perfected his appeal to this court.

Frank Fair was 51 and John Fair was 71 years of age at the time they were killed. At·the crossing in question the railroad tracks run east and ·west and the county road, over which the Fair brothers were ·traveling, runs north and south and intersects the railroad tracks at right angles. · For the last 37 years John and Frank had lived on their farm which· joined· the railroad right of way on the south, and which was east of the county road. Their house was about

one-half mile south of the crossing. They had passed over this cross-ing at least once a week during that period of time. On the day of the accident they were traveling north from their home in an auto-mobile jointly owned, and it is admitted that they were at that time engaged in a joint enterprise. The accident occurred about 11 A. M. on a clear, dry day. The car was driven upon the tracks at the inter-section and stalled and, while there, was struck by defendant's west-bound train, and both men instantly killed. The railroad track, east of the crossing, was straight for a considerable distance, and a mo-torist traveling on the road toward the crossing, when at a point 50 feet or more south of the track, had an unobstructed view to the east for at least 1780 feet. In other words, a motorist could see an ap-proaching train for that distance, and the trainmen could see an approaching automobile from the same distance.

Plaintiff offered evidence to the effect that there was no audible warning given of the train's approach, and that the train could have been stopped before striking their car after the trainmen saw or should have seen them in a position of peril. Because of the points presented for decision, we deem it necessary to make a more detailed statement of the evidence.

Witness Hoermann testified to the effect that, preceding the col-lision, he was driving east on highway No. 50, which runs parallel to and on the north side of the right of way; that he was traveling about 25 miles per hour; that when he was coming out of a dip on highway 50, he first observed the Fair automobile traveling north right even with a house, which is located 158 feet south of the rail-road track and east of the road on which the automobile was traveling; that, about the same time, or a second or two later, he saw the train approaching from the east; that he continued to drive and observed the movements of the automobile and saw the collision occur; that, from where he first saw it, the automobile continued on at a speed of about 20 miles per hour until it got onto the crossing and that it stop-ped on the crossing and did not move thereafter until struck by the train; that he was about 850 feet west of the crossing when he first ob-served the automobile, about 650 west of the crossing at a post with a white marker when the automobile stopped on the crossing, and about 100 feet west of the crossing at a double post when the collision oc-curred; that the train was traveling about 60 miles per hour; that, judging from the speed at which he travelled and his subsequent mea-surements the train was about 14 seconds away from the crossing when the automobile stopped on the railroad track. He stated that the whistle was not sounded or the bell rung after the train came in view.

Witness Atkinson testified that he went to the scene of the accident, a few days before the trial and made certain measurements and observations and prepared a plat, which appears in the transcript; that, from a point 1780 feet east of the crossing, up to the crossing,

there was nothing to obstruct the view of the fireman or engineer on a locomotive.

Witness Page testified that he was driving west on highway 50, racing with the train in question; that he kept up with the train until he had to slow down on account of another car between an eighth and a quarter of a mile from the crossing, and that, while he was keeping up with it, the train was traveling 67 miles an hour; that he did not know that a collision had occurred until he reached the crossing; that it was a chilly day but that the wind was blowing very little, if any. He stated no whistle was sounded or bell rung before the collision.

Witness Goodman testified that he made a sight test from a 2100 class engine (the engine pulling the train in question was No. 2125-T), and that the distance ahead from which the boiler does not obstruct the engineer's view of the left rail of the railroad track is a little more than 200 feet from the front of the pilot. He also gave testimony on the question of the distance within which the train could be stopped. We consider that matter later.

The testimony on behalf of the defendant was to the effect that, as the train traveled westward toward this crossing, there was a wind which blew the smoke from the engine and the steam from the whistle down on the fireman's (the left, or south) side of the engine; that all of the brake controls on the engine were on the engineer's (the right, or north) side; and that, while there were appliances both on the engineer's and fireman's side of the engine for sounding the whistle, there was only one whistle, consequently, while the engineer was sounding the whistle, the fireman could not do so.

Plaintiff's brakeman testified that the regular crossing whistle, consisting of two long, one short and one long blasts, was sounded as the train approached the crossing. The fireman testified that the train was traveling toward the crossing approximately 70 miles an hour; that, as the train approached the crossing he was at all times keeping a lookout ahead; that the engineer started sounding the whistle when about a quarter of a mile from the crossing; that the engineer sounded two long, a short and one long blasts of the whistle; that the steam from the whistle blew down on witness's side and obstructed his view so that he was not able to see ahead through it; that he did not see an automobile, either on or south of the crossing, as he looked out ahead until the steam lifted a "little bit" between the third and fourth blasts of the whistle, at which time he had a fleeting glimpse of the automobile headed north with the front wheels just over the south rail of the track and either stopped or going very slow; that the front of the engine was then about 100 feet from the crossing; that he immediately "hollered" to the engineer who applied the brakes in emergency.

The engineer testified that he was keeping a lookout ahead at all times as the train approached the crossing; that the train was traveling between 70 and 75 miles an hour; that, about the time the cab of the engine passed the whistling post about 1320 feet east of the crossing, he began sounding the regular crossing whistle, and continued to do so up to and over the crossing, with the exception of a slight break between blasts to keep them from sounding like one continued blast; that the boiler of the engine obstructed the view of the left rail ahead for approximately 412 feet; that, as he looked out ahead approaching the crossing, he did not see the automobile before the collision; that, when the front of the engine was not over 150 feet from the crossing, he heard the fireman call to him, whereupon he applied the brakes in emergency and the train traveled about 2100 feet before coming to a stop.

Defendant's first contention is that the court erred in overruling his motion to dismiss the petition because the title of the action does not include all the names of the purported plaintiffs. This contention is based on the theory that the title should have read, "Thomas W. Fair, Administrator of the estate of John H. Fair, deceased, and Thomas W. Fair, Administrator of the estate of Frank Fair, deceased," instead of reading as it does, "Thomas W. Fair, Administrator of the estate of John H. Fair, deceased, and Frank Fair, deceased, for and on behalf of * * *" (heirs of both deceased men). We think there is no merit in this contention. Each count of the petition alleges that Frank Fair and John H. Fair were killed simultaneously by the negligence of the defendant; and count one seeks to recover for the death of Frank, and count two seeks to recover for the death of John, both deaths resulting from the same acts of negligence on the part of the defendant. While the name of Thomas W. Fair appears but one time in the title, nevertheless his representative capacity is described as the administrator of his two deceased brothers. We think that is a sufficient compliance with Sec. 33, Civil Code, Laws Mo. 1943, p. 369. Any judgment rendered on this petition would be a complete bar to any other action for the death of these two men.

It is next contended that several claims have been improperly united in one petition. Secs. 16 and 37 of the Civil Code are pertinent to the proper joinder of parties and claims. Sec. 16 provides: "All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally or in the alternative in respect of or arising out of the same transaction, occurrence, or * * *"; and Sec. 37 provides: "The plaintiff * * * may join either as independent or as alternate claims as many claims * * * as he may have against an opposing party * * *." Defendant argues that since this suit is for the death of two persons, and that there is no cause of action at common law for the wrongful death of a person, and such action is purely a creature of the statute, then the *death* is the *occurrence*

which gives rise to the cause of action and not the *negligence* of defendant. The law seems to be to the contrary. Thorn et al. v. Cross, 201 S. W. (2d) 492; Chamberland v. Mo.-Ark. Coach Lines, (Mo.), 189 S. W. (2d) 538; Sporia et al. v. Pa. Greyhound Lines, Inc., 143 Fed. (2d) 105. These cases hold that the *negligence* of the defendant is the *occurrence* and not the resulting injuries or damages. Defendant relies on the case of Chamberland v. Mo. Coach Lines, *supra*. In that case the plaintiff filed two separate suits, one for the wrongful death of his wife, and the other for his own personal injuries. The defendant contended that both causes of action *must* be united since they grew out of the same *occurrence*. The court held that even though both causes of action grew out of a *single tort,* nevertheless, under Sec. 917, R. S. 1939, (now supplanted by Sec. 37, *supra*), a plaintiff *may* or *may not* join such causes of action. In other words, that section is merely permissive and not compulsory. Secs. 16 and 37 have greatly broadened the field for joinder of persons and claims. For a comprehensive discussion of this subject, see Carr Mo. Civ. Pro., Vol. 1, p. 147, et seq. and 357 et seq., and cases cited. We think there is no merit in this contention.

The next assignment is that the evidence failed to show plaintiff's witness Goodman was qualified as an expert, in consequence of which he was not competent to give opinion testimony on the distance within which the train could have been stopped at the given hypothetical speed by use of the emergency brakes. Goodman testified that he was employed as a fireman on the Alton Railroad in 1910; promoted to engineer in 1917, and continued to operate trains as an engineer until 1945; that he was employed by the Southern Pacific Railroad Company as an engineer in 1942 and served on that road for eight months, and then with the Pacific Electric in Los Angeles from February to August, 1944. He stated that he was familiar with the 2100 class Missouri Pacific engines; that he had operated engines of a similar class and type; that he was familiar with the Westinghouse 6 E. T. braking equipment, with which this engine and tender were equipped; that he used that type braking equipment on trains which he had operated for other railroads. He explained the operation of the Westinghouse 6 E. T. braking equipment, and testified that he operated trains composed of mixed equipment such as the one involved in this collision; that he had experience at stopping trains with emergency application of the brakes where said trains were composed of mixed equipment; that the construction and application of air braking equipment is practically the same on all passenger cars made and used by various railroad companies; that he was familiar with the braking equipment used on various passenger coaches and equipment used by various railroad companies; that a train, such as the one in question, traveling at the speed this train was traveling (67 miles per hour), could be stopped with an emergency application

of the brakes with safety to the engineer and passengers within a distance of 1100 feet. In answer to interrogatories, the defendant stated that the engine and tender of this train were equipped with Westinghouse air brakes No. 6 E. T.; that each car was equipped with air brakes, but that the type was unknown, and that the brakes on the entire train were in good mechanical condition and in good working order at the time of the collision.

We think witness Goodman was qualified to testify as an expert on the issue of the distance within which this train could be stopped. Our courts have said many times that the qualifications of an expert witness rest largely in the discretion of the trial court, and that the appellate courts will not convict the trial court of error unless it appears that such court has abused its discretion in permitting such expert to testify. Ambruster v. Levitt Realty and Investment Co., 341 Mo. 364, 375, 375, 107 S. W. (2d) 74, 80; Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2d) 120, 125, 126; Fitzgerald v. Thompson, 184 S. W. (2d) 198, 203. Defendant relies on the case of Grotjan v. Thompson, 140 S. W. (2d) 706, but that case is not in point because it appears that in a hypothetical question it was assumed that the train involved had *standard equipment;* while in the instant case the evidence is that the entire train was equipped with air brakes in good working condition at the time of the collision, and the manner of operating air brakes effectively was fully described. The court did not commit error in permitting Goodman to testify as an expert.

The next assignment of error is that defendant's motion for directed verdict as to each count should have been sustained because the evidence was not sufficient to make a humanitarian doctrine case on charges of negligent failure to sound an audible warning and to stop the train.

We do not understand that the defendant disputes the proposition that there was sufficient evidence from which the jury could find that no audible warning was given. Rather he takes the position that there was no evidence of obliviousness on the part of the occupants of the automobile, and that obliviousness is a necessary element to make a humanitarian case of failure to warn. There is evidence that the deceased were active, agile men; that the doors of the automobile were in good condition, and that the automobile was stalled on the railroad track for at least 14 seconds before the collision, all of which time the trainmen could have seen its position. It is to be presumed that had they known of the train's approach, they would have made an effort to escape from the track. There is nothing to indicate they intended to commit suicide.

While it is necessary to make proof of facts and circumstances tending to show obliviousness, if plaintiff seeks to rely upon a failure to warn, such burden of proof is met if, *from the facts and circumstances,* it can be reasonably inferred that the deceased were ob-

livious of the approach of danger. Obliviousness is but a subsidiary or evidentiary fact; the perilous situation of a party, and defendant's knowledge of it are the ultimate, necessary and issuable facts. Perkins v. Terminal R. Ass'n., 340 Mo. 868, 881, 102 S. W. (2d) 915, 921; Knorp v. Thompson, 175 S. W. (2d) 889, 899. We think there are sufficient facts in evidence from which the jury could infer that the deceased were oblivious of the approach of the train and that this element (obliviousness) of humanitarian negligence of failure to warn has been established.

But defendant contends, with reference to the submitted charge of failure to stop the train, that the evidence fails to show an ability to stop short of the point of collision after a duty arose under the humanitarian doctrine. In discussing this point defendant first contends that plaintiff's witness Goodman was not competent to give an opinion within what distance the train could be stopped. We have ruled that point against defendant and need not discuss it further. But he argues that even admitting the competency of witness Goodman, nevertheless there was no sufficient showing that the train was as much as 1400 feet or 14 seconds away from the crossing when any condition of humanitarian peril came into existence. The burden of his argument is to the effect that no humanitarian duty to apply the brakes existed from the moment the car stopped on the crossing because, under the evidence, the train at that time was approximately 1400 feet or 14 seconds away from the car, which would be ample time for the occupants of the car to escape, and therefore no duty arose to stop the train until it was obvious that the occupants of the car would not escape. Defendant cites authorities to the effect that trainmen are entitled to assume that one *approaching* a crossing will stop, and are placed under no humanitarian duty until he reaches a point so close to the track that he cannot stop. Poague v. Kurn et al., 346 Mo. 153, 140 S. W. (2d) 13; Clark v. A. T. & S. F. R. Co., 319 Mo. 865, 6 S. W. (2d) 954. We do not believe that doctrine applies to a situation where the trainmen see an automobile already stalled on the tracks. In Grotjan v. Thompson, *supra,* we said of a similar condition: ''It will not do to say an engineer who sees an automobile standing in the path presently to be occupied by his engine may proceed as though the way were clear until he is able to ascertain whether or not there is a human being in the automobile.'' In Bebout v. Kurn, *supra,* the court held that plaintiff made a *prima facie* case on the humanitarian duty to stop under facts quite similar to the evidence in the present case.

There was substantial evidence that no warning signal was given, and if that be true, as the jury found, then it became the duty of the defendant to use all reasonable means to stop the train when the trainmen saw, or should have seen, the automobile stalled on the tracks. On this point plaintiff's evidence is to the effect that the

automobile stopped on the track when the train was approximately 1400 feet and 14 seconds away from the point of collision and was traveling at approximately 67 miles an hour; and, that, under such conditions, the train could have been stopped within 1100 feet. When defendant saw, or, by the exercise of ordinary care could have seen, the automobile stop on the track, it became his duty to use any and all prudent and pleaded means at hand to avert the tragedy. Banks v. Morris and Company, 302 Mo. 254; Bebout v. Kurn, *supra*, (125).

Viewing the evidence in the light most favorable to the plaintiff, which we must do, we are of the opinion that a submissible case was made on the pleaded grounds of failure to warn and failure to stop. But regardless of whether the evidence was sufficient to submit the issue of negligent failure to stop, this would not cause a reversal of the case because plaintiff predicated a recovery on defendant's negligence in failing to warn and in failing to stop submitted in the *conjunctive* throughout. Since we conclude there is no doubt that plaintiff's evidence made a submissible issue of failure to warn, the fact that failure to stop was also submitted in the conjunctive would not be error, even if unsupported by evidence. Bowman v. Standard Oil Co., 169 S. W. (2d) 384, 386; Lonasa v. Downey, 201 S. W. (2d) 179, 182.

Defendant charges error in the giving of plaintiff's instruction No. 1. The first assignment is that there was not sufficient evidence to justify the submission of the two grounds of humanitarian negligence. What we have said disposes of this contention.

The next criticism is that the first paragraph erroneously injects the question of primary or antecedent negligence into a humanitarian submission. The paragraph reads: "The court instructs the jury that the railroad crossing at which the accident involved in this law suit occurred, was a public crossing and that it was the duty of both the engineer and the fireman on said train mentioned in evidence to exercise ordinary care to keep a look-out to discover persons and vehicles likely to be on, or near, said crossing and to use ordinary care to prevent injuring such persons." Then follows a detailed statement of the facts necessary to be found under the humanitarian doctrine of failure to warn and failure to stop. Defendant argues that this paragraph injected antecedent or primary negligence into the case. It has many times been held that it is prejudicial error to inject primary negligence into an instruction submitting humanitarian negligence. State ex rel. v. Bland, 322 Mo. 565, 15 S. W. (2d) 798; Reiling v. Russell, 153 S. W. (2d) 6; Bebout v. Kurn, *supra*, (127). But does this paragraph violate that rule? We think not. That paragraph merely refers to the duty which defendant owed to keep a lookout at a public crossing and which would bring the humanitarian doctrine into operation, even to undiscovered peril. A very similar paragraph was approved by the Supreme Court in the case of

Hoelzel v. Chicago, R. I. R. Co., 85 S. W. (2d) 126, 130, and the ruling in that case was approved by the same court in Reiling v. Russell, *supra*, (9). The paragraph in the instant case seems much less offensive than the one construed in the Hoelzel case, because, in that case the paragraph, after defining the duties of the trainmen to keep a lookout, declared that a failure to perform this duty was negligence as a matter of law; while in the instant case no such declaration is made. It merely defines the duty of the trainmen when approaching a public crossing. The pleadings admit that the accident occurred at a public crossing. See, also, Brown v. Alton R. Co., 151 S. W. (2d) 727, 744, 745. Defendant relies on the cases of Chastain v. Winton, et al., 347 Mo. 1211, 1220, 152 S. W. (2d) 165, 169; Mayfield v. Kansas City Southern Rwy. Co., 337 Mo. 79, 91, 85 S. W. (2d) 116, 123, and Bebout v. Kurn, *supra*. We think an examination of those cases will disclose the difference in the instructions considered.

The next criticism is leveled at the closing clause or "tail" of the instruction. After defining humanitarian negligence, and requiring the jury to find that defendant is guilty thereof, the criticized clause reads: "* * * and this is the law, even though you may believe and find that the deceased were careless and negligent in going upon the railroad track without discovering the approaching train." Defendant argues this clause is in conflict with his *sole cause* instruction. He relies upon the cases of Smithers v. Barker, 111 S. W. (2d) 47, and Grotjan v. Thompson, *supra*. The opinion in the Smithers case has many times been discussed, construed and interpreted. On first reading it lends support to defendant's contention, but subsequent appellate decisions have arrived at the conclusion that when plaintiff's main instruction *requires the jury to find that the defendant was negligent in a certain manner*, then the attaching of the clause or "tail" excluding *contributory negligence* of the plaintiff as a defense, does not conflict with defendant's *sole cause* instruction. This for the reason that the jury is first required to find that the defendant has been *guilty of negligence* as defined in the forepart of the instruction, and if the jury so finds, then it could not consistently find that the *negligence* of the plaintiff was the *sole cause* of the accident. In State ex rel. Snider v. Shain et al., 345 Mo. 950, 137 S. W. (2d) 527, the court en banc discussed this very question and distinguished the opinion in the Smithers case. The court stated that the cause had been submitted to the jury by an instruction defining humanitarian negligence in failing to stop, swerve or sound a warning; and told the jury that if they found that *as a direct result* of *defendant's negligence* plaintiff was injured, then they must find for plaintiff regardless of any other fact. In discussing the point now under consideration, the court said (530): "Of course, if the jury found that the injuries were the *direct result* of defendant's negligence, they couldn't find that they were due to the *sole negligence* of plaintiff.

In that sense, plaintiff's instruction would be the converse of a 'sole cause' instruction, but it would not prevent defendant from properly submitting his theory of sole cause.'' This theory has been followed many times since. See Bowman v. Standard Oil Co., *supra*, (Mo.); State ex rel. Alton R. Co. v. Shain, et al. (Mo.), 143 S. W. (2d) 233, 240; Deil v. St. Louis Public Service Co., 192 S. W. (2d) 608; Leavell v. Thompson, 176 S. W. (2d) 854, 861. In the instant case plaintiff's instruction hypothesizes the facts which were necessary for the jury to find before it could convict the defendant of negligence in failing to sound a warning or to stop, and then told the jury, ''and if you further find and believe from the evidence that said negligence \* \* \* on the·part of the defendant's agents \* \* \* was the direct and proximate cause of the accident and the death of \* \* \*, then your verdict should be for the plaintiff on both counts of his petition, \* \* \*''. Thus this part of the instruction would not be inconsistent with a *sole cause* instruction but would merely be the converse thereof. Instructions are construed as a whole; words, phrases, clauses or paragraphs are not to be torn from their setting. When the instant instruction is read as a whole it does not conflict with defendant's sole cause instruction. In State ex rel. Snider v. Shain, *supra*, the court en banc said of the opinion in the Smithers case that the language there used was so broad ''\* \* \* that it would eliminate as a defense any negligence of plaintiff, either contributory negligence or sole negligence.'' That is not true in the instant case. When a humanitarian instruction first requires the jury to find that the defendant *has been guilty of certain defined acts of negligence*, it leaves open to the defendant the right to submit, if the facts justify, the issue whether the accident was due to the *sole negligence* of the plaintiff, which would be a complete defense, but, nevertheless, the plaintiff is entitled to instruct the jury that he can recover even though he has been guilty of acts which may have *contributed* to his injuries, because *contributory negligence* is no defense in a humanitarian case.

We think defendant's criticism of the instant instruction is unfounded.

Defendant also contends that the instruction is erroneous because it assumed that the automobile did stop on the track, when there was evidence that it may not have reached a complete stop. We do not so read the instruction. It requires the jury to find that it was ''stopped or standing upon the railroad track. \* \* \*'' He also argues the instruction erroneously treats occupants of the automobile as being in imminent peril at the time it was driven on the track. We do not so understand the instruction. It requires the jury to find that the deceased were in a position of peril upon the track, and that defendant saw or, by the use of ordinary care, could have seen them in such a position of peril in time to give a warning and safely stop the train.

The instruction does not assume they were in a position of peril when the train was 14 seconds away.

It is also argued that the instruction is erroneously confusing. We deem it unnecessary to extend this opinion by copying the instruction. We have carefully examined it and do not consider it subject to this criticism. A very similar instruction was approved in Perkins v. Terminal RR Ass'n., *supra*.

It is also contended that plaintiff's instruction No. 4 is erroneous. The instruction merely defines the forms of verdicts which may be returned. Defendant's criticism is that it defines the form of verdict for *plaintiff* instead of for *plaintiffs*. He reargues the proposition that there should have been two plaintiffs designated in the caption instead of one, and that the instruction should also have been in the plural. What we have already said disposes of this contention.

It is next contended that the court erred in not discharging the jury, upon defendant's request, because of improper argument made to the jury by plaintiff's counsel. It seems witness Hoermann had given a written statement to defendant's claim agent, Sheridan, sometime after the accident, and shortly before the trial he went to Sheridan and asked for a copy of the statement because he had been to the scene of the accident and had made certain measurements and thought some corrections should be made in the written statement. Sheridan told him that he did not have a copy of the statement but that he would get him one. Counsel argued: ''Mr. claim agent Sheridan put him off four months, put him off. Not only he twisted his testimony, but he deliberately lied time after time and that is my opinion of his testimony.'' Defendant objected to the quoted statement and moved to discharge the jury. The court very promptly said: ''Mr. Miller (plaintiff's attorney) you should not have said that. There is no evidence to base that on. The jury will disregard it, take it out of your mind. The objection is well taken. However, I will not discharge the jury.'' Thereupon Mr. Miller stated: ''I apologize to the court, counsel and jury, and ask the jury to disregard the statement.'' Declaring a mistrial for improper argument rests largely within the discretion of the trial court, and the appellate court will not ordinarily interfere unless it appears that the court has abused its discretion. In the instant case the court promptly reprimanded plaintiff's attorney and directed the jury to disregard the statement; plaintiff's attorney very promptly apologized to the court and counsel and jury, and asked that the statement be disregarded. This question was considered by the trial court on the motion for new trial and it evidently concluded it was not prejudicial, and we are unwilling to say that it abused its discretion in so holding. Mooney v. Terminal Rwy. Ass'n. (Mo.), 186 S. W. (2d) 450, 454; Marlow v. Nafziger Baking Co. (Mo.), 63 S. W. (2d) 115, 120; Goyette v. St. Louis S. F. R. Co. (Mo.), 37 S. W. (2d) 552, 555.

Finding no reversible error, the judgment is affirmed. All concur.