Alvin PETERSON and Verla Peterson,
Respondents,

v.

Jimmie TIONA, Jr., Appellant.

No. 45273.

Supreme Court of Missouri.
Division No. 1.

July 9, 1956.

Lynn M. Ewing, Ewing, Ewing & Ewing,
Nevada, for appellant.

Orval H. Jewett, Joplin, for respondents.

COIL, Commissioner.

A jury awarded respondents $8,000 in their action for damages for the wrongful death of their 15 year old son, Ray Peterson. Defendant below, Jimmie Tiona, Jr., has appealed from the ensuing judgment. There is no controversy about the fact that Ray Peterson was killed about 1:00 a. m. on August 15, 1954, as he was riding his motorcycle southwardly on U. S. Highway 71 a short distance north of Horton, Missouri, as a result of defendant's automobile running into the cycle's rear.

Defendant contends that the trial court erred in refusing to direct a verdict for him at the close of all the evidence and in giving plaintiffs' instruction No. 2. Plaintiffs below abandoned their allegations of primary negligence and went to the jury on humanitarian negligence submitting disjunctively failure to stop or slacken or swerve.

■ To determine whether there was evidence to support each of the hypotheses that after Ray Peterson was in a position of imminent peril defendant, in the exercise of the highest degree of care, could have stopped or slackened or swerved and thereby have avoided the collision, we review the evidence from a standpoint favorable to plaintiffs, giving them the benefit of any part of defendant's evidence favorable to them and not contrary to their fundamental theory of recovery, giving them the benefit of all reasonable inferences from all of the evidence, and disregarding defendant's evidence unfavorable to them. Catanzaro v. McKay, Mo., 277 S.W.2d 566, 567 [1].

■ So viewing the evidence, a jury reasonably could have found the facts to be as they appear in this statement. U. S. Highway 71 at the time of the casualty was a 2-lane, concrete-paved road. The night was dark and cloudy. The pavement was dry. As one drives southwardly on 71 a short distance north of Horton there is an upgrade, prior to topping which one cannot see southwardly beyond the crest of that grade. From that crest southwardly the pavement is generally straight and level. Ray Peterson was riding a motorcycle on which there was no taillight and no rear fender. There was a seat cover, a portion of which hung below the seat, and on which there were three reflector buttons, two red and one green, each 1½ inches in diameter, all visible from the rear of the motorcycle. There was no evidence as to the speed at which Ray was traveling. From a mark made on an exhibit and from testimony that the motorcycle, as a result of the collision, was thrown toward the center of the highway, a reasonable inference was that, prior to the collision, Ray was traveling toward the right side of the right or west half of the pavement.

Defendant, with one front-seat passenger, was driving a 1954 Oldsmobile south on U. S. 71 at 60–65 miles per hour. When he reached the crest of the rise, he slowed to 55 m. p. h. He proceeded southwardly until he was within 20 feet of the moving motorcycle when he saw it for the first time. He applied his brakes, hit the motorcycle, dragged it under the car for 60 feet, and came to a stop 50 or 100 feet south of either the collision point or the place where the motorcycle was no longer entangled. The Oldsmobile was equipped with power steering, power brakes, and multiple-beam headlights, all in good working order.

The collision point was 1,040 feet south of the hill crest. Following the collision there were no tire marks at or near the collision point. There was no other traffic which could have affected the casualty, except one automobile which was proceeding northwardly at 55 m. p. h. When the Oldsmobile topped the rise and was 1,040 feet from the collision point, the northbound automobile was 1,640 feet south of defendant's car; and when the Oldsmobile was 350 feet north of the collision point, the northbound automobile was 950 feet south of the collision point. Defend-

ant's automobile was equipped with automatic dimmers so that the high beam was automatically deflected to low beam on the approach of the lights of another car. There was no evidence as to how close approaching lights had to be before the Oldsmobile's automatic dimmers operated. Defendant's headlights were such that one could see down the highway for "quite a ways * * * a block or so."

We have the view that the foregoing evidence was sufficient for a jury reasonably to find each of the hypotheses submitted in plaintiffs' humanitarian instruction. That conclusion is based on these considerations. Section 304.350 RSMo 1949, V.A.M.S., in effect at the accident date and until May 12, 1955, provided, in part, that a multiple-beam head lamp on the "uppermost distribution of light" should reveal persons and vehicles at a distance of at least 350 feet. In view of the fact that defendant's headlights were multiple beam in good working order, taking into account the fact that the jury reasonably could find that the northbound headlights were far enough away when the Oldsmobile was 350 feet from the motorcycle as not to have caused the Oldsmobile lights to automatically dim or to have necessarily interfered with defendant's vision, considering the direct evidence that defendant's headlights shone down the highway for a "block or so", and that there were three reflector buttons on the cycle's seat cover visible from the rear, and in view of the fact that it should not be assumed that the headlights on defendant's automobile were below legal requirements, Noland v. Pastor, 8 Cir., 191 F.2d 1009, 1013, we are of the opinion that a jury reasonably could have found that defendant, in the exercise of the highest degree of care, could have seen the motorcycle upon which deceased was riding when it was 350 feet away.

There was no expert testimony as to the distance in which a 1954 Oldsmobile equipped with power brakes could be stopped on a level dry pavement. There was evidence, however, as heretofore noted, that the Oldsmobile actually stopped in a total distance of from 130 to 180 feet (assuming, favorably to defendant, that the 50–100 feet testimony as to the distance which the Oldsmobile traveled after the collision was from the point where the motorcycle became disentangled rather than from the collision point). It is true that the motorcycle was caught beneath the Oldsmobile for a distance of 60 feet and that fact may have decreased the distance in which the Oldsmobile actually was brought to a stop. There was no evidence of defendant's reaction time. Assuming, in the absence of testimony, that defendant's reaction time was three fourths of a second, Vietmeier v. Voss, Mo., 246 S.W. 2d 785, 788 [5], it would appear that at 55 m. p. h. defendant would have traveled 60.48 feet during his reaction time. Consequently, a jury could have found defendant had at least 289.52 feet in which to stop prior to the collision. We say "at least 289.52 feet" because, while we do not know the speed at which the motorcycle was traveling, we do know that the motorcycle was moving forward and thus constantly increasing the distance which defendant had in which to stop; assuming, of course, the application of his brakes at the point 289.52 feet away, where the jury reasonably could have found he should have acted after having discovered deceased's position of imminent peril and after having reacted thereto.

■ We may not take judicial notice of the exact distance within which a specific automobile can be stopped under particular conditions. In some instances we take judicial notice of limits within which a stop can be made. Mallow v. Tucker, Mo., 281 S.W.2d 848, 850 [2–5]; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, 635, [10]. In our view, however, it is unnecessary, in the instant case, for us to take judicial notice even of stopping limits. That is because we are of the opinion that

the evidence that the automobile actually stopped, including reaction time, in a distance of 130–180 feet, even though that stopping distance may have been shortened by the circumstance of the entangled motorcycle, plus the further, noted fact that defendant had in excess of 289.52 feet after reaction time in which to stop, was sufficient substantial evidence from which a jury could have reasoned that defendant in the exercise of the highest degree of care, with the means and appliances at hand and with safety to himself and others, could have stopped his automobile and thus have avoided the collision with the motorcycle after he saw or should have seen deceased in a position of imminent peril.

What we have said concerning defendant's ability to stop is necessarily decisive of the fact that plaintiffs made submissible issues on slackening and swerving. It needs no argument to demonstrate the proposition that if one could have stopped prior to running into the rear of a moving motorcycle, he necessarily could have slackened sufficiently to have avoided a collision. And the only additional circumstance with respect to swerving was the fact that there was an approaching automobile which could have affected defendant's swerving to the left. As noted, however, the approaching automobile was always far enough away to preclude our holding that a jury could not find that defendant could have safely swerved to the left. In any event, however, decisive of the swerving question is the fact that the evidence showed that defendant had room to swerve to the right and thereby avoid the collision. And it is apparent that if, as we have held, a jury reasonably could have found that defendant could have stopped in time, then defendant's speed at the time he went around the motorcycle could have been of his own choosing.

It follows that the trial court did not err in refusing to direct a verdict for defendant.

■ Defendant contends that the court erred in giving plaintiffs' instruction 2. The first reason assigned is that the instruction did not hypothesize sufficient facts to permit the finding that the deceased came into a position of imminent peril of being struck by defendant's automobile. It is true that the language of the instruction in that portion which hypothesizes imminent peril is not as clear as it might be. The instruction in that respect says "that while the said Delmar Peterson was on Highway 71, two miles north of the Junction of D Highway, he became in imminent peril of being struck by defendant's automobile; * * *." Clearly, however, the instruction is not reversibly erroneous for the reason assigned because the facts that Peterson was riding a motorcycle south on U. S. 71 and was struck in the rear by defendant's following car were not in dispute. The essential finding, under the admitted physical facts, was not whether deceased was at some point in a position of imminent peril but whether defendant, in the exercise of the highest degree of care, could have discovered deceased's imminent peril in time thereafter to have avoided collision by doing one of the hypothesized alternatives. Consequently the jury could not have been misled or confused by the failure of plaintiffs' instruction to have specifically hypothesized more noncontroverted evidentiary facts. The jury would not have understood, as defendant contends, that the instruction meant that deceased was in imminent peril if he was on Highway 71.

Defendant also contends that plaintiffs' instruction 2 conflicted with defendant's instruction B and "would tend to confuse the jury". The specific attack is that this language of instruction 2 eliminated from the jury's consideration the theory of defense submitted by defendant's instruction B: "then you cannot find for the defendant on the ground that the said Delmar Peterson was negligent in so placing himself in such position of peril". Instruction B hypothesized Peterson's riding an unlighted motorcycle, defendant's topping a

rise which had obscured his vision, approaching lights which blinded defendant, and that because of those facts defendant did not see and, in the exercise of the highest degree of care, could not have seen Peterson in time, etc.

 Defendant says plaintiffs' instruction told the jury "that the fact that the motorcycle was unlighted was no defense at all." If the jury found the facts as hypothesized in the fore part of instruction 2 and found, as required, that defendant's negligence so found directly caused deceased's injury and death, then it was true that the fact that the motorcycle was unlighted was no defense because contributory negligence is no defense in a humanitarian case.

Defendant relies on the inapplicable case of Smithers v. Barker, 341 Mo. 1017, 1028, 111 S.W.2d 47, 53, wherein it was held that the particular language of the so-called "tail" on a humanitarian instruction there given would conflict with a proper sole cause instruction. In the first place, defendant's instruction B is not a sole cause instruction and none was requested or given. Secondly, the holding in Smithers, supra, has been explained by subsequent decisions as not ruling generally that a clause similar to that in the instant case conflicts with a proper sole cause instruction. See: Bowman v. Standard Oil Co., 350 Mo. 958, 964 [4], 169 S.W.2d 384, 387 [6]; State ex rel. Snider v. Shain, 345 Mo. 950, 956, 137 S.W.2d 527, 530; Fair v. Thompson, 240 Mo.App. 664, 680, 212 S. W.2d 923, 930 [15–17].

While we are of the opinion that plaintiffs' instruction 2 was inartfully drawn and is subject to criticism both in the choice of language used and in the arrangement of its clauses, we are convinced that when all the instructions were read as a whole, the jury clearly understood the facts necessary to be found which would correctly authorize a verdict for plaintiffs.

The judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.